# PAR PAINTING, INC. *v.* GREENHORNE & O'MARA, INC., ET AL.
## (AC 19013)

Landau, Pellegrino and Peters, Js.

Argued September 22, 2000—officially released January 9, 2001

*E. Timothy Sullivan, Jr.*, with whom, were *Anthony V. Zeolla* and, on the brief, *Gaffney Kane*, for the appellant (plaintiff).

*Steven W. Varney*, for the appellees (named defendant et al.).

*Richard Blumenthal*, attorney general, and *Peter R. Huntsman*, assistant attorney general, filed a brief for the commissioner of the department of transportation as amicus curiae.

*Opinion*

PELLEGRINO, J. The plaintiff, PAR Painting, Inc., appeals from the judgment of the trial court rendered after the granting of the motion by the defendants, Greenhorne & O'Mara, Inc., and two of its employees, Tony Guerin, Jr., and James Barranger, to set aside the jury's verdict in this action for tortious interference with business and contractual relations. The plaintiff claims that the court improperly determined that the evidence was insufficient to support the jury's findings that the defendants had tortiously interfered with the plaintiff's business relationships, that the defendants had violated General Statutes § 42-110b[1] of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., and that the plaintiff had suffered damages of $684,000 as a result. We agree with the trial court's decision to set aside the verdict and, accordingly, affirm the judgment of that court.

---

[1] General Statutes § 42-110b (a) provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

General Statutes § 42-110g (a) provides in relevant part: "Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action . . . to recover actual damages. . . . The court may, in its discretion, award punitive damages and may provide such equitable relief as it deems necessary or proper."

The following facts and procedural history are relevant to our consideration of the plaintiff's appeal. The plaintiff is a corporation engaged in the business of sandblasting and repainting steel structures, including highway bridges. Its president is Peter Papadogiannis. Greenhorne & O'Mara, Inc., is a corporation that is in the business of inspecting bridge repainting projects. Guerin and Barranger were employed by Greenhorne & O'Mara, Inc., as chief inspector and project manager, respectively, and were assigned to the project that is the subject of this appeal.

On April 20, 1994, the plaintiff, acting as a subcontractor, entered into a contract with Shipsview Construction (Shipsview), the prime contractor, to sandblast and repaint three bridges for the department of transportation (department). The largest of the three was the Crooked Street Bridge in Plainville, which was approximately 85,000 square feet. The other two bridges were approximately 55,000 square feet and 10,000 square feet. Pursuant to the terms of the contract, the plaintiff was to complete the work on all three bridges in 180 days, ending in October, 1994, for a payment of $1,085,000.

The department retained Greenhorne & O'Mara, Inc., to do the inspection work on the project. The compensation for Greenhorne & O'Mara, Inc., under its contract with the department was not wholly fixed. Part of the compensation structure was variable, depending on the amount of time that the company remained on the project. Its duties consisted, essentially, of inspecting the bridge surfaces after the plaintiff blasted to ensure that the old paint had been sufficiently removed and inspecting again after the plaintiff repainted to verify that the new paint was applied properly.

Because of health and environmental issues associated with the lead based paint previously used on the bridges, certain safeguards were necessary during the

stripping and repainting of the structures. It was necessary that containment structures be erected to capture the removed paint and that project workers be monitored to ensure that they were not exposed to high lead levels. It was essential to that operation that all of the old paint be thoroughly removed so that the new paint could adhere properly to the structure. An independent body, the Steel Structures Painting Council (council), developed standards applicable to the work in this project. Pursuant to their contracts, the parties were to follow those standards in every stage of the repainting and inspection process.

Although the plaintiff was scheduled to begin work on the Crooked Street Bridge in April, 1994, it did not start building its containment structure on the bridge until late July, 1994, approximately ninety days after the commencement date, nor had it begun working on the other two bridges included in its contract. The plaintiff encountered further delays when the containment structure had to be revised because it did not meet contract specifications. Consequently, the plaintiff did not actually begin doing any blasting work until late August, 1994.

Almost from the time that the blasting and repainting work commenced, the plaintiff and the Greenhorne & O'Mara, Inc., inspectors clashed over the plaintiff's noncompliance with contract specifications. In response to Papadogiannis' repeated complaints that the inspectors were unfairly critical of the plaintiff's work, department employees were sent to the project site several times to inspect the work. Each time, they agreed with the Greenhorne & O'Mara, Inc., inspectors that the plaintiff's work was deficient.

In October, 1994, the plaintiff's certification from the council lapsed for seven days, temporarily halting work on the bridge project. In the same month, some of the

plaintiff's employees were not allowed to work directly on the bridge when testing revealed that they had elevated blood lead levels. Disagreements between the plaintiff and Greenhorne & O'Mara, Inc., continued to escalate, and in November, 1994, the plaintiff voluntarily stopped work on the project and left the job. At that time, the plaintiff had completed about 33 percent of the work required by the contract.

The plaintiff instituted this action in December, 1994, alleging, inter alia, that Greenhorne & O'Mara, Inc., and its employees had performed inspections too slowly and in bad faith, resulting in monetary damages flowing from the plaintiff's inability to perform under the contract with Shipsview and the department, and from a damaged reputation that affected its ability to secure future contracts.[2]

After a trial, the jury, responding to a number of interrogatories,[3] found that Greenhorne & O'Mara, Inc.,

---

[2] The defendants filed a number of counterclaims. None is at issue in this appeal.

[3] The jury answered "yes" to each of the following interrogatories:

"1. Did the Defendant Greenhorne & O'Mara, by and through its employees, interfere with PAR Painting's business relationship with the prime contractor or the [department] on the project by intentionally and wrongfully delaying PAR's production at the Crooked Street Bridge? . . .

"2. Did the Defendant Greenhorne & O'Mara intentionally take an unnecessarily and unreasonably long time in inspecting the plaintiff's work? . . .

"3. Did the Defendant Greenhorne & O'Mara intentionally cause the plaintiff PAR Painting to redo work needlessly and unreasonably? . . .

"4. If the answer to Questions 1, 2 or 3 is yes, did any of those intentional acts cause actual loss and damage to PAR? . . .

"5. If the answer to Questions 1, 2 or 3 is yes, did any of those intentional acts constitute an unfair or deceptive trade (business) practice pursuant to Conn. Gen. Stat. § 42-110a et seq., the Connecticut Unfair Trade Practices Act? . . .

"6. If the answer to Question 5 is yes, do you find that PAR Painting suffered loss and damage as a result of those unfair and deceptive trade (business) practices? . . . [Also, do you] find that the actions of Greenhorne & O'Mara, its agents or employees in committing the unfair or deceptive acts [was] done maliciously or with an improper or unjustifiable motive or intent? . . ."

The jury fixed the amount of actual damages referred to in interrogatory

and its employees had tortiously interfered with the plaintiff's business relationships with the department and with Shipsview. The jury also found that the defendants' actions amounted to unfair acts prohibited by CUTPA. The jury awarded the plaintiff total damages of $689,000. See footnote 3.

The defendants then filed a motion to set aside the jury's verdict, arguing, inter alia, that the verdict was contrary to the law and unsupported by the evidence. The court agreed and rendered judgment setting aside the verdict. The court held that there was insufficient evidence to support the jury's findings that the defendants' conduct was tortious, and that there was a causal connection between the defendants' conduct and the plaintiff's losses. Additionally, the court determined that the award of damages and the finding of CUTPA violations were unsupported by the evidence. The plaintiff thereafter appealed.

A court is empowered to set aside a jury verdict when, in the court's opinion, the verdict is contrary to the law or unsupported by the evidence. *Kurti* v. *Becker*, 54 Conn. App. 335, 337, 733 A.2d 916, cert. denied, 251 Conn. 909, 739 A.2d 1248 (1999). "A verdict should not be set aside, however, where it is apparent that there was some evidence on which the jury might reasonably have reached its conclusion." (Internal quotation marks omitted.) Id. "Before determining whether the granting of a motion to set aside is proper, the trial court must look at the relevant law that it gave the jury to apply to the facts, and at the facts that the jury could have

number four at $664,000 and the amount of actual damages referred to in interrogatory number six at $10,000. It also awarded $5,000 in punitive damages because of the improper motives referred to in interrogatory number six.

Interrogatories one through four were repeated, essentially, as to the defendants Guerin and Barranger. The jury again answered "yes" to each interrogatory and awarded $5000 in damages against Guerin and Barranger.

found based on the evidence. The law and evidence necessarily define the scope of the trial court's legal discretion. . . . This discretion vested in the trial court is not an arbitrary or capricious discretion, but, rather, it is legal discretion to be exercised within the boundaries of settled law. . . . This limitation on a trial court's discretion results from the constitutional right of litigants to have issues of fact determined by a jury. . . . The trial court, upon a motion to set aside the verdict, is called on to question whether there is a legal reason for the verdict and, if there is not, the court must set aside the verdict." (Citations omitted; internal quotation marks omitted.) *Suarez* v. *Sordo*, 43 Conn. App. 756, 759–60, 685 A.2d 1144 (1996), cert. denied, 240 Conn. 906, 688 A.2d 334 (1997).

In reviewing a trial court's decision to set aside a jury verdict, we must consider the evidence in the light most favorable to the party who succeeded before the jury. *Kurti* v. *Becker*, supra, 54 Conn. App. 337. "While an appellate court must give great weight to a trial court's decision to set aside a verdict, an appellate court must carefully review the jury's determinations and evidence, given the constitutional right of litigants to have the issues decided by a jury. Great weight should be given to the action of the trial court and the presumption is that a verdict is set aside only for good and sufficient reason. However, the record must support that presumption and indicate that the verdict demonstrates more than poor judgment on the part of the jury. . . . While we do not attempt to substitute our judgment for that of the trial judge, we must determine whether the jury award was such that the trial judge could have properly substituted his judgment for that of the jury. . . . An appellate court, therefore, in reviewing whether a trial court abused its legal discretion, must review the entire record and [all] the evidence." (Citations omitted; internal quotation marks omitted.)

*Suarez* v. *Sordo,* supra, 43 Conn. App. 760–61; see also *Jerz* v. *Humphrey,* 160 Conn. 219, 224–25, 276 A.2d 884 (1971); *Marin* v. *Silva,* 156 Conn. 321, 323, 240 A.2d 909 (1968); *Burns* v. *Metropolitan Distributors,* 130 Conn. 226, 228–29, 33 A.2d 131 (1943).

The jury found that Greenhorne & O'Mara, Inc., and its employees had tortiously interfered with the plaintiff's business relationships with Shipsview and the department. Further, the jury found the defendants' conduct to be the basis of a CUTPA violation. Pursuant to the standards outlined above, we must review the law governing those claims and the evidence presented at trial to determine whether the court abused its discretion in setting aside the jury's verdict.

I

The cause of action for tortious interference with business relations has long been recognized in Connecticut. *Blake* v. *Levy,* 191 Conn. 257, 260, 464 A.2d 52 (1983). Nonetheless, "not every act that disturbs a contract or business expectancy is actionable. . . . [F]or a plaintiff successfully to prosecute such an action it must prove that the defendant's conduct was in fact tortious. This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously. . . . [A]n action for intentional interference with business relations . . . requires the plaintiff to plead and prove at least some improper motive or improper means. . . . The plaintiff in a tortious interference claim must demonstrate malice on the part of the defendant, not in the sense of ill will, but intentional interference without justification." (Citations omitted; internal quotation marks omitted.) *Daley* v. *Aetna Life & Casualty Co.,* 249 Conn. 766, 805–806, 734 A.2d 112 (1999); *Blake* v. *Levy,* supra, 260–62.

After conducting a careful review of the evidence produced at trial, we agree with the trial court that the evidence was insufficient to support the jury's finding of intentional, wrongful conduct on the part of the defendants, an essential element of the claim of tortious interference with business relations. As the court explained, because it is in the very nature of an inspector's function to interfere with the work being inspected,[4] evidence of a malicious motive is crucial. Essentially, the plaintiff needed to show that the defendants were purposely rejecting work that actually met the council's standards. The only evidence of alleged improper motive by Greenhorne & O'Mara, Inc., that the plaintiff presented, however, was the former's variable compensation structure,[5] and Papadogiannis' testimony that Greenhorne & O'Mara, Inc., employees laughed one day when the plaintiff's equipment became stuck in mud.[6]

On the other hand, the defendants presented an abundance of evidence to show that the plaintiff's work was in fact inadequate and that the inspectors, in criticizing that work, merely were doing what they had been hired to do. Emmanuel DiMauro, project engineer for the

[1] In recognition of the naturally opposed roles of inspectors and workers on construction projects, and of the importance of the inspection function for ensuring public safety, the department filed an amicus brief, asking that we recognize a "qualified inspector's privilege to interfere," which would insulate inspectors from claims of this type. Although the point that fear of liability might "chill individual inspectors in their often contentious relations with contractors" is well taken, we decline to recognize an inspector's privilege at this time, as it is unnecessary to our resolution of the issues on appeal.

[5] The defendants elicited testimony to show that although Greenhorne & O'Mara, Inc., was to receive variable compensation for its costs, its profit was a fixed amount. Pursuant to its personal services agreement with the department, which was introduced as an exhibit at trial, the schedule of payments for Greenhorne & O'Mara, Inc., included payroll costs plus a maximum 145 percent overhead multiplier and a "fixed fee for profit."

[6] It was established that Papadogiannis did not personally witness this incident.

department, testified that he visited the project site ten times in response to Papadogiannis' complaints about the inspectors. DiMauro agreed each time that the plaintiff's work was substandard. Russell Wagoner, a department engineer, and Arthur Gruhn, construction administrator for the department, also testified that the plaintiff's work did not meet specifications. Mohammad Khadeer, formerly with Greenhorne & O'Mara, Inc., but working for the department at the time of trial, testified similarly. Many photographs had been taken of the work that failed inspections. Those photographs were reviewed by the defendants' expert, who agreed that the work was inadequate. In light of the evidence presented, we agree with the court that the plaintiff failed to show that the defendants acted with improper motive, an essential element of proving tortious interference with a business relationship.

Further, even if the evidence were sufficient for the jury to find that Greenhorne & O'Mara, Inc., and its employees acted maliciously toward the plaintiff, the jury could not properly have concluded that such action was the cause of the plaintiff's inability to complete the bridge project within the time specified by the contract. "It is axiomatic that causation must be removed from the realm of speculation and conjecture." *Samose* v. *Hammer-Passero Norwalk Chiropractic Group, P.C.*, 24 Conn. App. 99, 103, 586 A.2d 614, cert. denied, 218 Conn. 903, 588 A.2d 1079 (1991).

Papadogiannis himself testified that the plaintiff did not begin blasting work until half of the allotted time for the contract had expired. He acknowledged that his containment structure was initially not built according to his own plans and that the lapse in his company's certification from the council resulted in one week of down time. He agreed that high blood lead levels kept some of his employees from working in the bridge containment structure. He conceded that at least some

of the criticism by Greenhorne & O'Mara, Inc., of the plaintiff's work was appropriate.

Papadogiannis and his employees testified, contrary to the plaintiff's own log books, that the Greenhorne & O'Mara, Inc., inspectors took too long to conduct their inspections, sometimes one and one half to two hours instead of the typical forty-five minutes, and that repeat inspections were conducted. Despite evidence of the plaintiff's very late start date and its other difficulties with the containment structure, employees' blood lead levels and the certification lapse, the jury found that the conduct of the defendants was the factor that kept the plaintiff from finishing its work on time. Even when viewing the evidence most favorably to the plaintiff and assuming that duplicate two hour inspections in fact occurred, the jury could not with reasonable certainty conclude that such inspections were the reason that the plaintiff had completed only 33 percent of the work well after the contract period had already expired. We therefore agree with the court's determination that "[g]iven the many nonactionable delays which occurred on the project, it was impossible for the jury to find without resort to speculation or conjecture, that the defendants' tortious conduct, as opposed to its legitimate inspections or the plaintiff's own delays, caused the plaintiff's losses."[7]

## II

We need not discuss at length the court's decision to set aside the jury's award of CUTPA damages because

---

[7] Even if the plaintiff had proved liability, it failed to present sufficient evidence to support its claim for damages. "It is axiomatic that the burden of proving damages is on the party claiming them. . . . When damages are claimed they are an essential element of the plaintiff's proof and must be proved with reasonable certainty." (Internal quotation marks omitted.) *Lawson* v. *Whitey's Frame Shop*, 241 Conn. 678, 689, 697 A.2d 1137 (1997). We agree with the trial court that the evidence presented was insufficient to establish the plaintiff's alleged damages with reasonable certainty, either for lost profit or for lost opportunities.

we agree that there was insufficient evidence to support that finding as well.

"In determining whether a practice violates CUTPA we use the criteria of whether [it] offends public policy or comes within some established concept of unfairness, whether [it] is immoral, unethical, oppressive or unscrupulous or whether it causes substantial injury to consumers, competitors or other businessmen." *Muniz* v. *Kravis*, 59 Conn. App. 704, 713, 757 A.2d 1207 (2000); see *Associated Investment Co. Ltd. Partnership* v. *Williams Associates IV*, 230 Conn. 148, 155, 645 A.2d 505 (1994).

The plaintiff alleged the same wrongful conduct as the basis for both its tortious interference and CUTPA claims, i.e., that the Greenhorne & O'Mara, Inc., inspectors were forcing the plaintiff's painters to repeat work that actually met council standards. We note here that improper conduct that does not rise to the level of tortious interference may, nonetheless, constitute a CUTPA violation. See, e.g., *Sportsmen's Boating Corp.* v. *Hensley*, 192 Conn. 747, 474 A.2d 780 (1984). As we explained in part I of this opinion, the evidence presented at trial was insufficient to establish that the Greenhorne & O'Mara, Inc., inspectors did anything at all improper. Instead, it only was shown that the inspectors were performing the function mandated by their contract with the department. In addition, the plaintiff's failure to prove a causal relationship between the inspectors' actions and the plaintiff's losses is equally fatal to the CUTPA allegation. See footnote 1. The court, therefore, was justified in also setting aside the damages flowing from the jury's finding of a CUTPA violation.

The judgment is affirmed.

In this opinion the other judges concurred.