# DOWNES-PATTERSON CORPORATION ET AL. *v.* FIRST NATIONAL SUPERMARKETS, INC.
## (AC 20506)

Lavery, C. J., and Spear and O'Connell, Js.

Argued February 21—officially released July 24, 2001

*Robert M. Shields, Jr.*, with whom were *Wesley W. Horton* and, on the brief, *Michael J. Quinn*, for the appellants (plaintiffs).

*Everett E. Newton*, for the appellee (defendant).

*Opinion*

LAVERY, C. J. The plaintiffs, Downes-Patterson Corporation (Downes-Patterson) and S.S. Brooklyn, LLC,[1] appeal from the judgment of the trial court setting aside a jury verdict in their favor.[2] The plaintiffs claim on appeal that the court abused its discretion in setting aside the verdict because the evidence presented at trial was sufficient to support the jury's finding that the defendant[3] had (1) violated the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., and (2) tortiously interfered with the plaintiffs' business expectancies under a lease with a third party. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts, most of which were stipulated to by the parties. In 1959, the defendant purchased real property in the town of Brooklyn from Pauline Schulze. The defendant

[1] Downes-Patterson is the owner of the real property implicated in this appeal. S.S. Brooklyn, LLC, is a development company owned 99 percent by Downes-Patterson and 1 percent by Downes-Patterson's principal, Paul Klotz. In this opinion, we will refer to Downes-Patterson and S.S. Brooklyn, LLC, collectively as the plaintiffs.

[2] The trial court did not rule on the defendant's motion for a directed verdict until after the jury returned a verdict in favor of the plaintiffs. After the verdict was returned, the court granted the defendant's motion, in effect setting aside the verdict. See Practice Book § 16-37.

[3] First National Supermarkets, Inc., formerly was the defendant. Topps, Inc., successor to First National Supermarkets, Inc., was substituted as the defendant on May 16, 2000. In this opinion, we will refer to them interchangeably as the defendant.

subsequently sold the property to ECONN Associates (ECONN) and leased it back, operating a Finast supermarket thereon since 1965.

Between 1960 and 1965, Downes-Patterson purchased adjacent property from Schulze. Pursuant to a prior agreement between Schulze and the defendant, Downes-Patterson held its property subject to a restrictive covenant. The restrictive covenant barred the owner of the land from operating a supermarket on the premises. Downes-Patterson did not develop the land but, around 1990, began negotiating with Stop & Shop Supermarkets, Inc. (Stop & Shop), with the aim of constructing a supermarket on the property. It was intended that Stop & Shop would lease the supermarket from the plaintiffs upon its completion.

At about that time, the plaintiffs brought a declaratory judgment action against ECONN and the defendant. The plaintiffs sought to have the restrictive covenant preventing the operation of a supermarket on their property declared invalid. The court, *Rittenband, J.*, found that, because it contained no time limitation, the restrictive covenant was void as against public policy, and the defendant appealed. That decision is not at issue for purposes of the present appeal; the events giving rise to the present appeal occurred while the appeal concerning the validity of the restrictive covenant was pending before our Supreme Court.

The Supreme Court heard oral argument on the appeal on December 2, 1994. The defendant's position before the court was that a time limitation should be implied as to the restrictive covenant, that limitation being for as long as the defendant or its successor operated its neighboring supermarket. The defendant argued that, once it ceased to operate a supermarket on its property, the restrictive covenant would have no purpose and no longer would be valid.

On February 24, 1995, before the Supreme Court had rendered a decision on the parties' appeal, the plaintiffs learned from a local newspaper that the defendant planned to close its supermarket in early March, 1995. Shortly thereafter, the defendant did close the supermarket. Considering that the defendant's argument on appeal had been undermined by its closing of the store, the plaintiffs approached the defendant on March 2, 1995, and asked whether the defendant had any objections to the plaintiffs' beginning construction of a Stop & Shop store on their parcel. The defendant told the plaintiffs that it had no objections to the proposed construction.

On March 16, 1995, the plaintiffs signed a long-term lease agreement with Stop & Shop. The agreement provided that, if the pending litigation between the plaintiffs and the defendant was not finally resolved by May 1, 1995, Stop & Shop could terminate the lease, with an option to reinstate it within one year if it so desired.[4] The plaintiffs commenced construction of the physical plant that was to become the Stop & Shop store.

---

[4] Specifically, § 7.1 (a) (i) of the lease provides in relevant part that "[i]f, prior to the Approval Date, Landlord is unable to obtain the Required Approvals and/or there has not been a final determination in the matter of *Downes-Patterson, Inc.* vs. *First National Supermarkets, Inc. and ECONN Plaza Associates Limited Partnership* filed in the Judicial District of Windham County, Connecticut at Putnam (the 'Existing Litigation') such that there will be no restriction against Tenant's use of the demised premises as contemplated by Section 9.1 hereof, Tenant may elect to terminate this Lease at any time thereafter by sending written notice thereof to Landlord, whereupon this Lease will terminate as of the date specified in the Tenant's notice and Landlord and Tenant shall have no further obligation to each other."

Section 7.1 (a) (iii) of the lease provides in relevant part that "[i]n the event this Lease shall be terminated by Tenant . . . if, at any time within twelve (12) months of said termination by Tenant (the 'reinstatement period'), there is a final determination in the Existing Litigation to the extent contemplated by subparagraph (i) herein . . . . Tenant shall have the right and option to reinstate this Lease . . . ."

During the next two months, the plaintiffs' attorney, Eric Lukingbeal, and the defendant's attorney, Richard C. Robinson, communicated regularly via facsimile and telephone. Lukingbeal advised Robinson that the plaintiffs needed signed releases of the restrictive covenant from both the defendant and its landlord, ECONN, to obtain title insurance. Robinson agreed to relay the requests to his clients. On April 4, 1995, Robinson received from Lukingbeal two release of covenant forms. Robinson forwarded them to ECONN and the defendant. ECONN executed and returned its release form on April 19, 1995. The defendant did not sign and return its release form.

Lukingbeal called Robinson repeatedly throughout April, 1995, asking for the defendant's release form. During an April 21, 1995 telephone conversation, Lukingbeal expressed urgency and concern that the defendant had not yet signed the release. On April 26, 1995, Lukingbeal wrote Robinson a letter, warning that unspecified "serious financial consequences" would result if the release were not signed and that the plaintiffs would seek indemnification from the defendant if this occurred.[5] The letter did not mention the plaintiff's

---

[5] The text of the April 26, 1995 letter is as follows:

"Dear Rick:

"I write to request that you put your client, First National Supermarkets, on notice of the risk of a potential claim against it by Downes-Patterson, Inc.

"Several weeks ago, in response to my inquiry whether it would be appropriate for Downes-Patterson to begin construction on the Brooklyn site, you relayed a message to me via voice mail to go ahead. My inquiry was prompted by a newspaper article that First National was closing its Brooklyn store. In a later conversation, you asked me to send to you the necessary forms for your clients to sign releasing any claims that the restrictive covenant was enforceable. First National has now had the release form, and has not manifested any objection to it, for a considerable time. In reliance upon the foregoing, and in the expectation that the signed form would soon be in hand, Downes-Patterson has in fact commenced construction.

"While we are very appreciat[ive] of your efforts to get the release form signed, we must ask you to inform your client that serious financial consequences may result if the form is not promptly signed and returned. Downes-Patterson will look to First National Supermarkets for indemnification

agreement with Stop & Shop or the May 1, 1995 deadline. At that point in time, the parties still were awaiting a decision from the Supreme Court on the appeal.

The next day, the defendant filed a motion with the Supreme Court asking that the appeal be withdrawn. Robinson informed Lukingbeal of the motion and obtained the plaintiffs' consent to the granting of the motion. Both attorneys believed that withdrawal of the appeal would satisfy the plaintiffs' requirements. On May 1, 1995, to the surprise of all of the parties, the Supreme Court denied the defendant's motion. Lukingbeal again called Robinson, who told Lukingbeal that the defendant would not sign the release. Lukingbeal sent the defendant another letter on May 4, 1995, warning for the first time that Stop & Shop, "which is going to occupy the store under a lease when it is built, and which is financing the construction, may decide not to close on the construction loan if this issue is not resolved quickly." Nonetheless, the letter did not mention that the lease already had been signed or that it contained a termination provision contemplating an already passed deadline.[6] The defendant did not sign the release.

should it suffer any damages caused by the delay in First National's signing the form.

"Very truly yours,

"Eric Lukingbeal"

[6] The text of the May 4, 1995 letter is as follows:

"Dear Rick:

"In response to my letter dated April 26, 1995, your client, First National Supermarkets, Inc., filed a motion to withdraw its appeal. As you know, the Supreme Court denied the motion on May 1, without explanation. We have requested, again, that First National sign the release of restrictive covenant.

"Today, you advised me that First National would not sign the release of restrictive covenant (which we had sent to you over a month ago). No reason was given. You also told me that First National could not enforce the covenant even if the Supreme Court upholds it. That is a position with which we agree, and the fact that it is your client's position makes it all the more puzzling that First National will not sign the release. This was the release you asked me to send to you for First National to sign. There has never been any objection to the release language, nor has there been any

On May 9, 1995, the Supreme Court advised the defendant that it would reconsider the defendant's motion to withdraw the appeal. A hearing was scheduled for May 24, 1995. On May 12, 1995, Lukingbeal notified Robinson that Stop & Shop had terminated its lease with the plaintiffs on May 10, 1995. The plaintiffs blamed the defendant for that development and again threatened litigation. On May 19, 1995, the defendant delivered a photocopy of the executed release to the plaintiffs.[7] On May 24, 1995, the hearing on the motion to withdraw the parties' appeal was held as scheduled and, on June 1, 1995, the Supreme Court granted the motion, terminating the litigation over the validity of the restrictive covenant. Stop & Shop nonetheless declined to exercise its option to reinstate the lease.

reason given for not signing it.

"The financial risk First National is now running is quite substantial. Downes-Patterson proceeded in reliance on First National's actions, all as described in my April 26, 1995 letter. No one has challenged anything said in that letter. Stop & Shop, which is going to occupy the store under a lease when it is built, and which is financing the construction, may decide not to close on the construction loan if this issue is not resolved quickly. Stop & Shop has already put Downes-Patterson on notice that Downes-Patterson is proceeding at its own risk in continuing with construction. Downes-Patterson would not have done so absent First National's conduct. The release language has been reviewed and approved by the title insurance company, and title insurance is necessary in order for Stop & Shop to proceed to enter into a lease for the property. We intend to hold First National liable for whatever damages Downes-Patterson may incur in the event the construction loan does not close, in the event Stop & Shop decides not to proceed further, or in the event Downes-Patterson is damaged in any other way.

"Everyone involved is amazed that First National would willingly continue to run such a risk of incurring potential liability so easily avoided. We can only speculate as to its reasons, as none have been offered. This letter is written to point out the gravity and urgency of the situation, and with the hope that reason may still prevail.

"I look forward to your response after consultation with your clients.

"Very truly yours,

"Eric Lukingbeal"

[7] The defendant, without acknowledging culpability, offered to provide the original of the executed release of restrictive covenant in exchange for a release of liability from the plaintiffs.

Construction on the store ceased and, in November, 1996, the plaintiffs brought an action against the defendant. The plaintiffs alleged, among other things, that the defendant's refusal to sign the release of the restrictive covenant constituted tortious interference with the plaintiff's contract with Stop & Shop and, further, that the refusal amounted to a CUTPA violation.

After a short trial, the jury found in favor of the plaintiffs on each of those allegations and awarded the plaintiffs $2.8 million in damages.[8] The court, *Aurigemma, J.*, set aside the jury's verdict, reasoning that there could be no tort or CUTPA violation because the defendant had no legal duty to sign the release of restrictive covenant form as demanded by the plaintiffs. This appeal followed.

We begin by articulating our standard of review. "A court is empowered to set aside a jury verdict when, in the court's opinion, the verdict is contrary to the law or unsupported by the evidence. . . . A verdict should not be set aside, however, where it is apparent that there was some evidence on which the jury might reasonably have reached its conclusion. . . . Before determining whether the granting of a motion to set aside is proper, the trial court must look at the relevant law that it gave the jury to apply to the facts, and at the facts that the jury could have found based on the evidence. The law and evidence necessarily define the scope of the trial court's legal discretion. . . . This discretion vested in the trial court is not an arbitrary or capricious discretion, but, rather, it is legal discretion to be exercised within the boundaries of settled law. . . . This limitation on a trial court's discretion results from the constitutional right of litigants to have issues of fact determined by a jury. . . . The trial court, upon a

---

[8] The $2.8 million represented lost profits under the lease. Stop & Shop fully reimbursed the plaintiffs for the costs they had expended on construction.

motion to set aside the verdict, is called on to question whether there is a legal reason for the verdict and, if there is not, the court must set aside the verdict." (Citations omitted; internal quotation marks omitted.) *PAR Painting, Inc.* v. *Greenhorne & O'Mara, Inc.*, 61 Conn. App. 317, 322–23, 763 A.2d 1078, cert. denied, 255 Conn. 951, 770 A.2d 31 (2001).

"In reviewing a trial court's decision to set aside a jury verdict, we must consider the evidence in the light most favorable to the party who succeeded before the jury. . . . While an appellate court must give great weight to a trial court's decision to set aside a verdict, an appellate court must carefully review the jury's determinations and evidence, given the constitutional right of litigants to have the issues decided by a jury. Great weight should be given to the action of the trial court and the presumption is that a verdict is set aside only for good and sufficient reason. However, the record must support that presumption and indicate that the verdict demonstrates more than poor judgment on the part of the jury. . . . While we do not attempt to substitute our judgment for that of the trial judge, we must determine whether the jury award was such that the trial judge could have properly substituted his judgment for that of the jury. . . . An appellate court, therefore, in reviewing whether a trial court abused its legal discretion, must review the entire record and [all] the evidence." (Citation omitted; internal quotation marks omitted.) Id., 323.

The jury found that the defendant tortiously interfered with the plaintiffs' contract with Stop & Shop. Further, the jury found the defendant's conduct to be the basis of a CUTPA violation. Pursuant to the standards previously outlined, we must review the law governing those claims and the evidence presented at trial to determine whether the court abused its discretion in setting aside the jury's verdict.

## I

The plaintiffs first claim that the court abused its discretion in setting aside the jury's finding that the defendant, in refusing to sign the release of the restrictive covenant, violated CUTPA.[9] The plaintiffs argue that the court improperly imputed a duty requirement to a CUTPA cause of action. We disagree.

In setting aside the jury's verdict, the court ruled as follows: "[T]he issue of whether or not [the defendant] had a duty to issue this release is a question of law. As a matter of law . . . I rule, that they had no duty. If they had a duty, then there is nothing other than Stop & Shop's own incredibly tight time frame, of which First National was not aware, that required that this duty be exercised by May 1st or May 10th. As a matter of fact, it appears that once [the defendant] learned that there was this time frame, and that by not issuing this release something had been—a lease had been forfeited. They issued the release. So if they had a duty to do it, they did it. There is nothing that required them to act so expeditiously as Stop & Shop required, so there can be no interference when the active interference is the failure to do that which one does not have a duty to do. And if there is no duty to issue this release, there can be no unfair trade practice."

"Connecticut courts, when determining whether a practice violates CUTPA, will consider (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is

---

[9] General Statutes § 42-110b (a) provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen). . . . Thus, a violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy." (Citation omitted; internal quotation marks omitted.) *Kenney* v. *Healey Ford-Lincoln-Mercury, Inc.*, 53 Conn. App. 327, 330, 730 A.2d 115 (1999).

The plaintiffs are correct in pointing out that, as a general matter, the existence of a duty is not a prerequisite to a finding of a CUTPA violation. Where a plaintiff alleges that a defendant's *passive* conduct violates CUTPA, however, common sense dictates that a court should inquire whether the defendant was under any obligation to do what it refrained from doing. That is illustrated by the cases in which we have held that defendants did not violate CUTPA by failing to disclose information when they were under no legal obligation to disclose that information. See, e.g., id., 330–31 (used car dealer did not violate CUTPA in failing to disclose to purchaser that car had been part of rental fleet and had been in prior collision), citing *Normand Josef Enterprises, Inc.* v. *Connecticut National Bank*, 230 Conn. 486, 523, 646 A.2d 1289 (1994) (bank did not violate CUTPA by failing to disclose to judgment creditor the reason debtor's account had insufficient funds to satisfy judgment); *Southington Savings Bank* v. *Rodgers*, 40 Conn. App. 23, 28–29, 668 A.2d 733 (1995) (bank did not violate CUTPA by failing to notify defaulting debtor-depositors that hold had been placed on their accounts), cert. denied, 236 Conn. 908, 670 A.2d 1307 (1996).

We find those holdings to be instructive. Just as the failure to disclose what one is not required to disclose does not violate public policy, the failure to release a right that one is not required to release similarly does

not contravene public policy. Here, the defendant possessed a property right that it had bargained for when it purchased its land from Schulze in 1959. The final adjudication of the validity of the right still was pending. The plaintiffs promised Stop & Shop that they would achieve a result that it was not within their power to compel. Although the plaintiffs hoped and even expected that the defendant would sign a release of the right, the defendant was under no statutory or contractual obligation to do so. Under those circumstances, the defendant did not violate CUTPA by declining to do that which it simply was not required to do. The analysis does not differ because the plaintiffs, effectively, gambled on an expectation that the defendant would choose to proceed differently than it did and, subsequently, lost that gamble.

After reviewing the evidence and the law governing the plaintiffs' CUTPA claim, we hold that the court did not abuse its discretion in setting aside the jury's verdict thereon on the basis that the defendant was under no duty to release the restrictive covenant.

## II

The plaintiffs next claim that the court abused its discretion in setting aside the jury's finding that the defendant, in refusing to sign the release of the restrictive covenant, tortiously interfered with the plaintiffs' business expectancy under their lease with Stop & Shop. Again, the plaintiffs argue that the court improperly imputed a duty requirement into their tortious interference claim. We disagree.

"[I]n order to recover for a claim of tortious interference with business expectancies, the claimant must plead and prove that: (1) a business relationship existed between the plaintiff and another party; (2) the defendant intentionally interfered with the business relationship while knowing of the relationship; and (3) as a

result of the interference, the plaintiff suffered actual loss." *Hi-Ho Tower, Inc.* v. *Com-Tronics, Inc.*, 255 Conn. 20, 32–33, 761 A.2d 1268 (2000).

Although Connecticut courts "long [have] recognized a cause of action for tortious interference with contract rights or other business relations . . . [the case law indicates, nonetheless,] that not every act that disturbs a contract or business expectancy is actionable. . . . [F]or a plaintiff successfully to prosecute such an action it must prove that the defendant's conduct was in fact tortious. This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously. . . . [An] action for intentional interference with business relations . . . requires the plaintiff to plead and prove at least some improper motive or improper means. . . . The plaintiff in a tortious interference claim must demonstrate malice on the part of the defendant, not in the sense of ill will, but intentional interference without justification. . . . In other words, the [plaintiff] bears the burden of alleging and proving lack of justification on the part of the [defendant]." (Citations omitted; internal quotation marks omitted.) *Daley* v. *Aetna Life & Casualty Co.*, 249 Conn. 766, 805–806, 734 A.2d 112 (1999).

"Stated simply, to substantiate a claim of tortious interference with a business expectancy, there must be evidence that the interference resulted from the defendant's commission of a tort. [A] claim is made out [only] when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself. . . . [Not e]very act of interference is . . . tortious." (Internal quotation marks omitted.) *Golembeski* v. *Metichewan Grange No. 190*, 20 Conn. App. 699, 703–704, 569 A.2d 1157, cert. denied, 214 Conn. 809, 573 A.2d 320 (1990), quoting *Blake* v. *Levy*, 191 Conn. 257, 261, 464 A.2d 52 (1983).

Although the plaintiff again is correct in its assertion that the test for tortious interference contains no explicit duty requirement, we think that the discussion in part I regarding the role of the concept of duty in the analysis of the CUTPA claim is equally applicable here and, as such, does not bear repeating.[10] Furthermore, we conclude that the evidence submitted by the plaintiffs to prove the defendant's tortious interference otherwise was lacking, to the extent that it could not support the verdict issued by the jury.[11]

First, the evidence submitted was insufficient to show that the defendant knew of an active lease between the plaintiffs and Stop & Shop with a critical May 1, 1995 deadline. Lukingbeal's April 26, 1995 letter to Robinson warned only generally that the plaintiffs would suffer "serious financial consequences" if the defendant did not sign the release, but mentioned nothing of an existing agreement with Stop & Shop containing a termination provision. See footnote 5.

---

[10] We note that the court, in its charge to the jury, accurately relayed the elements of a claim of tortious interference with a business expectancy. It went on to explain that to establish the element of intentional interference under the circumstances of this case, the plaintiffs needed to show that the defendant had a duty to sign the release before May 1, 1995. The court explained its reasoning to the parties' attorneys on the record prior to charging the jury: "I have a question mark in my mind as to whether inaction can ever be intentional interference. I can really find no case on that, but I think that's a problem here. But assuming inaction can constitute interference, which we must assume if you're going to have any sort of a cause of action, then the question becomes, was there a duty to sign anything on the part of First National? Because, obviously, if inaction can be tortious interference or interference, the failing to do something can only be interference where you have a duty to do it. So, that's the real question here. Was there a duty to sign the release?" Those portions of the record make it clear that the court applied the proper legal rule, but considered that, under the circumstances of this case, duty was a necessary subelement of the element of intentional interference. We agree.

[11] "We may affirm a proper result of the trial court for a different reason." *Biro* v. *Hirsch*, 62 Conn. App. 11, 16 n.7, 771 A.2d 129, cert. denied, 256 Conn. 908, 772 A.2d 601 (2001).

Lukingbeal's May 4, 1995 (postdeadline) letter mentions that "Stop & Shop . . . is going to occupy the store under a lease when it is built" and that "title insurance is necessary in order for Stop & Shop to proceed to enter into a lease for the property." Those statements imply a future, not current, lease agreement and again, there is no mention of the critical deadline date or termination provision. See footnote 6. Lukingbeal testified, equivocally, that he believed that he had informed Robinson that there was a lease.

Even when viewing the evidence in the light most favorable to sustaining the verdict and, therefore, assuming that the jury found Lukingbeal's testimony more credible than his letters, there still remains no evidence whatsoever that Robinson ever was made aware of the critical terms of that lease. In fact, Lukingbeal testified that he, himself, was not aware that May 1, 1995, was a significant date in the Stop & Shop agreement. Because there was no evidence that the defendant was aware that its failure to sign the release of covenant form by May 1, 1995, would give Stop & Shop the option to terminate its agreement with the plaintiffs, the jury could not reasonably have reached the conclusion that the defendant, by its inaction, "intentionally interfered with the business relationship [of the plaintiffs] while knowing of the relationship . . . ." *Hi-Ho Tower, Inc.* v. *Com-Tronics, Inc.*, supra, 255 Conn. 33.

Second, the plaintiffs provided insufficient evidence of the defendant's alleged "improper motive or improper means." As previously explained, to prevail on a tortious interference claim, a plaintiff must prove "interference [that is] wrongful by some measure beyond the fact of the interference itself." (Internal quotation marks omitted.) *Golembeski* v. *Metichewan Grange No. 190*, supra, 20 Conn. App. 703. Here, the plaintiffs showed only that the defendant declined to

release a property right that it was under no obligation to release. No evidence was put forth that tended to show that the defendant was acting maliciously, other than the fact that Finast and Stop & Shop were competing chains, and the plaintiffs' bare assertion that there was no reason for the defendant to refuse to sign the form. In fact, the defendant at trial offered several plausible reasons for its refusal.[12] Further, the fact that the defendant moved to withdraw its appeal from the Supreme Court, a gesture that all parties believed would meet the plaintiffs' requirements, undercuts the plaintiffs' assertion that the defendant maliciously was seeking to interfere with the Stop & Shop deal.

The lack of evidence of improper motive also is documented in Lukingbeal's letters to Robinson. In the April 26, 1995 letter, Lukingbeal wrote that the defendant "has not manifested any objection to [releasing the covenant]." In the May 4, 1995 letter, Lukingbeal wrote that "[t]here has never been any objection to the release language, nor has there been any reason given for not signing it" and that the plaintiffs could "only speculate as to [the defendant's] reasons, as none have been offered." Because of the dearth of evidence in that regard, we conclude that the jury likewise could only speculate as to the defendant's motive and, therefore, its finding that it was an improper one was not reasonable.

After reviewing the evidence and the law governing the plaintiffs' tortious interference claim, we hold that the court did not abuse its discretion in setting aside the jury's verdict thereon.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[12] For example, Robert W. Sullivan, a former attorney for the defendant, testified that different levels of intracorporate approval were necessary to authorize a gratuitous release of the covenant.