******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

MIRANDA VARLEY *v.* FIRST
STUDENT, INC., ET AL.
(AC 36826)

Gruendel, Alvord and Flynn, Js.

*Argued February 19—officially released July 14, 2015*

(Appeal from Superior Court, judicial district of Middlesex, Aurigemma, J.)

*Theodore W. Heiser*, for the appellant (plaintiff).

*Peter J. Murphy*, for the appellee (defendant Regional School District 4).

*Opinion*

GRUENDEL, J. The plaintiff, Miranda Varley, appeals from the summary judgment rendered by the trial court in favor of the defendant, Regional School District 4.[1] The plaintiff claims that the court improperly determined that no genuine issue of material fact existed as to whether (1) the defendant was her employer for purposes of analyzing her wrongful discipline and discharge claim under General Statutes § 31-51q, and (2) the defendant tortiously interfered with her contractual employment relationship. We affirm the judgment of the trial court.

Mindful of the procedural posture of the case, we set forth the following facts as gleaned from the pleadings, affidavits and other proof submitted, viewed in a light most favorable to the plaintiff. See *Martinelli* v. *Fusi*, 290 Conn. 347, 350, 963 A.2d 640 (2009). The defendant is a regional school district organized under General Statutes § 10-39 et seq. It encompasses the towns of Chester, Deep River and Essex. Those towns retain individual boards of education that oversee their respective pre-kindergarten through sixth grade educational programs. The Region 4 Board of Education oversees educational programs for grades seven through twelve. The defendant's supervision district committee (committee) is comprised of members from those four boards of education. The committee oversees the shared services of those entities, including school bus services.

In June, 2006, the committee entered into a contract with First Student Transportation, Inc. (First Student), to secure transportation services for the defendant (contract). That contract details certain responsibilities of "bus drivers employed by" First Student. In addition, the contract provides that First Student will "discontinue the utilization under this contract of operators considered unsatisfactory by the Superintendent of Schools upon written notice thereof." In March, 2010, an amendment was executed that extended the contract through the 2014–2015 school year and increased compensation rates. That amendment further specified that "[e]xcept as expressly modified, amended or supplemented herein, the [c]ontract is hereby reaffirmed and ratified by the parties in its entirety."

First Student hired the plaintiff as a school bus driver in 2008. During the 2009–2010 school year, she was assigned to certain routes in Clinton, and occasionally provided "fill in" coverage for routes with the defendant. At the start of the 2010–2011 school year, First Student assigned the plaintiff to route four with the defendant, which consisted of a kindergarten run in Essex and an elementary school run in Chester. The plaintiff encountered "a lot of problems" on that elementary school run. As she explained in her deposition

testimony: "I got this run from a prior bus driver who had no control over the kids, so they were free to think it was okay to walk up and down the aisles, scream out the window, throw things out the window." In an effort to ameliorate that behavior, the plaintiff established assigned seats for each student, which led to complaints from a parent whose special education child was forced to sit by himself.

On one afternoon, the plaintiff encountered unruly behavior by students while driving them home from Chester Elementary School. After checking with Frank Kulick, her supervisor at First Student, she turned the bus around and returned to the school. Once at the school, the plaintiff was met by Principal Mike Barile, who was "infuriated" with her for doing so because a child with a known medical issue needed to get home immediately. The plaintiff testified that Barile thought her conduct in bringing the bus back to the school was a danger to the student. On another occasion, Barile confronted the plaintiff on the school sidewalk after receiving a complaint from someone who had walked by her bus and overheard her screaming at the children inside.

In light of the foregoing, the defendant's representatives met with Kulick. In a letter dated November 10, 2010, Kulick informed the plaintiff that she "needed to be removed from your route [in Chester] and receive additional training regarding certain aspects of your job as a school bus driver."[2] Kulick reassigned the plaintiff to a route in Clinton and assured her that "you are not losing your employment with First Student or any standard hours." He further asked the plaintiff to "[p]lease keep this district matter confidential."

Days later, the plaintiff went to the office of Ruth I. Levy, the defendant's superintendent of schools. The plaintiff inquired as to why she had been removed from her route in Chester. That confrontation upset Kulick, who prepared another letter that concerned her encounter with Levy, which the plaintiff acknowledged in writing on November 19, 2010. Kulick's letter stated in relevant part: "I . . . counseled you directly and told you not to go to [Levy] over this matter. At that time you agreed and assured me that you would not. On November 16 you went to [Levy's] [o]ffice unannounced in direct conflict with what I had directed you on [November] 10. . . . In [my prior letter] I requested that you keep this matter confidential due to its sensitivity. You have not and I have had many employees approach me regarding this matter and your discussions of it. This letter is a written warning that you are not to go to [Levy] over a work related matter. Further instances of this type of behavior will result in further progressive discipline up to and including termination. . . . I strongly encourage you to conduct yourself professionally over this matter and not have unsolicited

meetings with our customers."

The following school year, First Student assigned the plaintiff to route fourteen with the defendant, which involved the Essex Elementary School. Soon after the school year commenced, the plaintiff experienced problems with one child in particular, identified as John Doe in her complaint, who engaged in bullying behavior through name-calling and physical contact with other children on the bus.[3] When the plaintiff issued a verbal warning to John Doe, the child responded by swearing at her, and telling her to shut up and mind her own business. In response, the plaintiff, in accordance with the defendant's policies, thereafter filed written incident reports with First Student on approximately six to twelve occasions. Copies of those reports were furnished to the defendant, as well as the child's guardian, who voiced objection thereto.[4]

Joanne Beekley, the principal of Essex Elementary School, did not consider the reports of John Doe's behavior to constitute reports of bullying "[d]ue to the child's disability." In light of that undisclosed disability, the defendant's representatives decided to have the child's planning and placement team (team) handle those reports. Despite the defendant's policy requiring bus drivers to submit written reports when a student strikes another student, the team nonetheless decided that it would be preferable to have any future reports of physical contact involving John Doe made verbally. The purpose of that directive was to avoid "escalating the relationship between the child's guardian, the school, and the [plaintiff]," which impaired the team's ability to "work with the family to deescalate the behaviors . . . ."[5] Levy testified at her deposition that "when there is a special education child who has a specific [individualized educational program], that [program] would be superseding" to any district policy regarding written incident reports on its buses.

Accordingly, Assistant Principal Deborah O'Donnell thereafter advised the plaintiff to stop preparing written reports on John Doe's behavior. Instead, O'Donnell requested that the plaintiff verbally notify her when he exhibited such behavior. When the plaintiff informed her supervisor of that request, Kulick responded, "[a]bsolutely not, that's not protocol and you know that." As a result, when John Doe later exhibited such behavior on her bus, the plaintiff again prepared a written report.

Two days later, Kulick received a copy of a memorandum from Beekley to Levy dated November 16, 2011, regarding Beekley's concerns about the plaintiff's "judgment and appropriateness with students." That memorandum identified four areas of concern. With respect to her handling of John Doe, Beekley wrote that the plaintiff's "reliability in reporting events that happen on the bus is questionable, as one child in particular

seemed to be the target of her bus referrals. When investigating we found that other children admitted their involvement yet they never were reported to administration." Beekley also noted that "several students . . . needed to meet with the school counselor and administration because they were distraught and felt they needed to help" the plaintiff "in response to comments made by [the plaintiff] regarding her employment."[6] The memorandum further stated that because the plaintiff had provided candy to students on Halloween, Beekley was "concerned as there might be students with allergies, it violates our Wellness Policy, and could be a choking hazard."[7] The memorandum also noted that the plaintiff had asked "at least two students what she could purchase for their mother as a Christmas gift," which led Beekley to "question the reason" she would do so.[8] Beekley then stated that those concerns had been communicated to Kulick, who assured her that the plaintiff "will be reassigned as soon as possible to another school district." In concluding, Beekley stated that "I am not sure that we want [the plaintiff] to drive any bus for [our] schools now or in the future."

After receiving that memorandum, Levy spoke with Kulick and, pursuant to her authority under the terms of the contract, requested that the plaintiff be removed from her Essex Elementary School run.[9] In her deposition testimony, Levy stated that her request was motivated by concerns about the plaintiff's judgment and communication, as outlined in Beekley's memorandum. In particular, Levy's decision was informed by "the concerns that were brought up regarding a special education student in Chester and then a special education student in Essex in regard to overall behavior management on the bus," as well as various complaints from parents. Those concerns, as well as the defendant's experience with the plaintiff during the prior school year and the plaintiff's refusal to follow the directive not to file written reports on John Doe, collectively gave rise to "a more serious concern" about her fitness as a bus driver. Levy acknowledged in her deposition that she simply informed Kulick of that concern; she did not ask him to look into the merits thereof. Levy also stated that, in her tenure both as assistant superintendent and superintendent of schools for the defendant, she did not recall making any other requests to First Student to remove a bus driver.

On December 1, 2011, the plaintiff attended a meeting of the committee. The minutes of that meeting indicate that, during the public comment session, the plaintiff "noted that she lives in Ivoryton[10] and is a bus driver for First Student. She complained that she was let go from driving for Chester, and now in Essex. She feels that she has been treated unfairly and asked the [c]ommittee to review her case and reinstate her." (Footnote added.) The plaintiff explained that she "went to see if they can look into [the] allegations against me and if

they can do an actual investigation . . . . I went there looking for [the committee to] please look into this; I'm doing my due diligence, I'm abiding by state laws, federal laws, school district laws." When she concluded, Committee Chair Linda Hall thanked the plaintiff for her comments and stated that those comments "will be looked into."

Levy was in attendance at the committee's December 1, 2011 meeting. The next day, she contacted Kulick and requested that the plaintiff be removed from all routes with the defendant, including her kindergarten run in Essex. The plaintiff subsequently received a letter from Kulick informing her that the defendant had "requested that you no longer drive home to school routes. This is in part due to your inappropriate behavior at [the committee] meeting, and primarily for handing out presents and candy to student passengers. Both of these behaviors are unacceptable, by First Student standards. Rather than termination, due to a good and safe driving history, you are being transferred to the Clinton District, with the clear understanding that these behaviors will not be repeated. This is to be considered your final written warning. Any further student management violations, or violation of any other company policy, at any time in the future, will be considered cause for immediate termination . . . ."

The plaintiff thereafter telephoned Hall on approximately three occasions to inquire whether the committee had reviewed the concerns she raised at the December 1, 2011 meeting. When Hall returned the plaintiff's call, she informed the plaintiff that the committee "still hadn't had a special meeting yet" to address those concerns.

On February 28, 2012, the plaintiff again attended a meeting of the committee. Before that meeting began, Hall approached the plaintiff and informed her that "there was nothing [the committee] could do" and that she would be hearing from the defendant's attorney. The minutes of that meeting provide in relevant part: "Public Comment—[The plaintiff] from Ivoryton spoke regarding her concern over safety for students on the buses. She said she has removed her own child from the bus due to fears for their safety. She also again voiced her displeasure over no longer being allowed to drive a bus in the district due to disciplinary action against her by First Student." The next day, Levy contacted Kulick and informed him that the plaintiff again had appeared at a committee meeting to voice her displeasure "with the employment situation."[11] An upset Kulick then telephoned the plaintiff and notified her that First Student was terminating her employment due to her appearance at the committee meeting. After calming down, Kulick telephoned the plaintiff again later that day and asked her to report to work in Clinton. The plaintiff complied, and thereafter continued her

employment with First Student.

One week later, the defendant's legal counsel contacted the plaintiff by letter dated March 7, 2012. That letter stated in relevant part: "It recently has come to my attention that you have been contacting [Hall] and the [defendant's] [a]dministration on a regular and persistent basis regarding the status of your employment as a bus driver. Please be advised the Chester, Deep River, Essex, and [defendant's] Boards of Education are not your employers. Rather, you are employed by First Student. Hence, any inquiries or concerns with respect to your employment with First Student should be directed to the attention of First Student and not the members of the Chester, Deep River, Essex, or [defendant's] Boards of Education or their agents. To that end, please cease and desist from any such future regular and persistent communication in this regard."

The plaintiff continued her employment with First Student after being reassigned to routes in Clinton. Sometime between January and April, 2012, a student on one of her Clinton routes filed a complaint against the plaintiff, alleging favoritism. Although she was not disciplined by First Student, the plaintiff testified that she voluntarily resigned from that route. In April, 2012, the plaintiff voluntarily quit her employment by submitting a resignation letter to First Student.[12] In her deposition testimony, the plaintiff testified that she resigned due to her own concerns about her ability to properly comply with First Student policies.[13]

This civil action followed. The plaintiff's operative complaint contains two counts. The first count alleges wrongful discipline and discharge on the part of the defendant in violation of § 31-51q. The second count alleges that the defendant tortiously interfered with her contractual employment relationship with First Student. Following discovery, the defendant moved for summary judgment on both counts, which the court granted. This appeal followed.

Before considering the particular claims advanced by the plaintiff in this appeal, we note that "[o]ur standard of review governing a court's grant of summary judgment is well established. Summary judgment is appropriate when the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . As the court's decision on a motion for summary judgment is a legal determination, our review on appeal is plenary. . . . Because litigants ordinarily have a constitutional right to have issues of fact decided by the finder of fact, the party moving for summary judgment is held to a strict standard. [The moving party] must make a showing that it is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact. . . . A material fact is

a fact that will make a difference in the result of the case. . . . [T]he burden of showing the nonexistence of any material fact is on the party seeking summary judgment . . . . It is not enough for the moving party merely to assert the absence of any disputed factual issue; the moving party is required to bring forward . . . evidentiary facts, or substantial evidence outside the pleadings to show the absence of any material dispute. . . . The party opposing summary judgment must present a factual predicate for his argument to raise a genuine issue of fact. . . . Once raised, if it is not conclusively refuted by the moving party, a genuine issue of fact exists, and summary judgment is inappropriate. The court is required to view the facts presented in a motion for summary judgment in the light most favorable to the party opposing the motion. . . . [I]ssue-finding, rather than issue-determination, is the key to the procedure. . . . [T]he trial court does not sit as the trier of fact when ruling on a motion for summary judgment. . . . [I]ts function is not to decide issues of material fact, but rather to determine whether any such issues exist." (Citations omitted; internal quotation marks omitted.) *Vollemans* v. *Wallingford*, 103 Conn. App. 188, 192–93, 928 A.2d 586 (2007), aff'd, 289 Conn. 57, 956 A.2d 579 (2008). "The test is whether the party moving for summary judgment would be entitled to a directed verdict on the same facts." (Internal quotation marks omitted.) *SS-II*, *LLC* v. *Bridge Street Associates*, 293 Conn. 287, 294, 977 A.2d 189 (2009).

## I

The plaintiff contends that the court improperly concluded that no genuine issue of material fact exists as to whether the defendant was her employer for purposes of analyzing her wrongful discipline and discharge claim under § 31-51q. In her principal appellate brief, the plaintiff concedes that "[s]he was directly employed by First Student." She nevertheless submits that application of § 31-51q to the facts of this case compels the conclusion that the defendant also was her employer. We disagree.

The proper interpretation of § 31-51q presents a question of statutory construction, over which our review is plenary. *Plato Associates*, *LLC* v. *Environmental Compliance Services*, *Inc.*, 298 Conn. 852, 862, 9 A.3d 698 (2010). "The principles that govern statutory construction are well established. When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning . . . [General Statutes] § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after

examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Citation omitted; internal quotation marks omitted.) *Francis* v. *Fonfara*, 303 Conn. 292, 297, 33 A.3d 185 (2012).

We thus begin our analysis with the text of the statute. Section 31-51q provides: "Any employer, including the state and any instrumentality or political subdivision thereof, who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or 14 of article first of the Constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge, including punitive damages, and for reasonable attorney's fees as part of the costs of any such action for damages. If the court determines that such action for damages was brought without substantial justification, the court may award costs and reasonable attorney's fees to the employer." As this court has recognized, "an employer-employee relationship is required to establish standing" thereunder. *Young* v. *Bridgeport*, 135 Conn. App. 699, 706, 42 A.3d 514 (2012). Nevertheless, the term "employer" is not defined by that statute.

"It is a cardinal rule of statutory construction that statutory words and phrases are to be given their ordinary meaning in accordance with the commonly approved usage of the language. See General Statutes § 1-1 (a) ('[i]n the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language'). As our Supreme Court held almost one century ago, '[t]he words of a statute are to be interpreted in their natural and usual meaning unless the context indicates that a different meaning was intended. By our statute words and phrases are to be construed according to the commonly plain usage of language.' *Brown* v. *New Haven Taxicab Co.*, 92 Conn. 252, 254, 102 A. 573 (1917); accord *State* v. *Grullon*, 212 Conn. 195, 200, 562 A.2d 481 (1989) (words of statute to be given their ordinary meaning unless context dictates otherwise); *Caldor, Inc.* v. *Heffernan*, 183 Conn. 566, 570, 440 A.2d 767 (1981) (statutory term must be 'interpreted in its natural and usual meaning unless the context indicates that a different one was intended'); *Gural* v. *Fazzino*, 45 Conn. App. 586, 588, 696 A.2d 1307 (1997) (in interpreting language of statute, words must be given plain and ordinary meaning and natural and usual sense). 'To ascertain

the commonly approved usage of a word, we look to the dictionary definition of the term.' . . . *Stone-Krete Construction, Inc.* v. *Eder*, 280 Conn. 672, 678, 911 A.2d 300 (2006); see also *Hartford/Windsor Healthcare Properties, LLC* v. *Hartford*, 298 Conn. 191, 200–201, 3 A.3d 56 (2010) (appropriate to look to common understanding of term as expressed in dictionary if statute does not sufficiently define term)." *Lane* v. *Commissioner of Environmental Protection*, 136 Conn. App. 135, 148, 43 A.3d 821 (2012), aff'd, 314 Conn. 1, 100 A.3d 384 (2014).

In its memorandum of decision, the court did precisely that, noting that the term "employer" is defined as "[o]ne who employs the services of others; one for whom employees work and who pays their wages or salaries." (Internal quotation marks omitted.) Recourse to various dictionaries confirms the accuracy of that ordinary meaning. See, e.g., Black's Law Dictionary (9th Ed. 2009) p. 604 (defining "employer" as "[a] person who controls and directs a worker under an express or implied contract of hire and who pays the worker's salary or wages"); Webster's Third New International Dictionary (2002) p. 743 (defining "employer" in relevant part as "the owner of an enterprise . . . that employs personnel for wages or salaries"); Random House Webster's Unabridged Dictionary (2d Ed. 2001) p. 638 (defining "employer" as "a person or business that employs one or more people, esp. for wages or salaries"); American Heritage Dictionary (2d College Ed. 1985) p. 428 (defining "employer" as "a person or concern that employs persons for wages or salary").

The definition applied by the court is consistent with that set forth in several related statutes in title 31, chapter 557, part II of the General Statutes, all of which pertain to regulations concerning the protection of employees, and which specifically define "employer" as "a person engaged in business who has employees . . . ." See General Statutes §§ 31-40c (a) (2); 31-40j (2); 31-40q (a) (2); 31-40t (a) (2); and 31-51m (a) (2); see also General Statutes §§ 31-51r (a) (1) ("'[e]mployer' means any person engaged in business who has twenty-six or more employees") and 31-51tt (a) (2) ("'[e]mployer' means any person engaged in business who has one or more employees"). It is a well established canon of statutory construction that "[a]n identical term used in [statutory provisions] pertaining to the same subject matter should not be read to have differing meanings unless there is some indication from the legislature that it intended such a result." (Internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 78, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004). There is no indication that the legislature intended the term "employer," as it is used in § 31-51q, to have a meaning different from its ordinary usage, as embodied in the aforementioned statutes. When the legislature wants to depart from that

ordinary meaning, it certainly knows how to do so. See, e.g., General Statutes § 31-51kk (4) (defining "employer" as "a person engaged in any activity, enterprise or business who employs seventy-five or more employees, and includes any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer and any successor in interest of an employer, but shall not include the state, a municipality, a local or regional board of education, or a private or parochial elementary or secondary school").

In this case, the plaintiff admits that she was directly employed by First Student—indeed, the second count of her complaint alleges that the defendant tortiously interfered with her contractual employment relationship with First Student. The plaintiff also admits that she was paid by First Student; that her hours of employment and bus route assignments were set by First Student; and that her supervisor was Kulick, a contract manager for First Student. The plaintiff likewise does not dispute that she never received a paycheck, tax forms, health insurance or other benefits from the defendant. She further has not alleged that she was the defendant's employee under an express or implied contract of hire. Accordingly, under the commonly approved usage of the term, the defendant plainly does not qualify as the plaintiff's employer.

Nonetheless, because the defendant exercised its right under the contract to communicate its concerns to First Student regarding the plaintiff's performance, and ultimately requested the discontinuation of her services on certain routes, the plaintiff submits that it is reasonable to construe § 31-51q as conferring employer status on the defendant. We disagree with that strained reading of the term "employer," which suggests that whenever two parties contract for certain services, the customer also becomes the employer of the vendor's employees that perform services therefor. The legislature could not have intended such an absurd result.[14] See *State* v. *Spears*, 234 Conn. 78, 92, 662 A.2d 80 (principles of statutory construction require that we not construe a statute in a manner that will lead to absurd consequences or bizarre results), cert. denied, 516 U.S. 1009, 116 S. Ct. 565, 133 L. Ed. 2d 490 (1995). Moreover, as evidenced by other statutory provisions in which it has carved out a more expansive definition of the term "employer"; see, e.g., General Statutes § 31-51kk (4); we presume that if the legislature intended § 31-51q to encompass such a scenario, it would have said so. See *Lucarelli* v. *State*, 16 Conn. App. 65, 70, 546 A.2d 940 (1988) ("[c]ourts must interpret statutes as they are written . . . and cannot, by judicial construction, read into them provisions which are not clearly stated" [citation omitted]).

We conclude that the term "employer," as it is used

in § 31-51q and as applied to the facts of this case, is not susceptible to more than one reasonable interpretation. The court properly construed that statute in determining that there was no genuine issue of material fact as to whether an employer-employee relationship existed between the parties, a necessary prerequisite to an action under § 31-51q.[15] See *Young* v. *Bridgeport*, supra, 135 Conn. App. 706. For that reason, summary judgment properly was rendered in favor of the defendant on the first count of the plaintiff's complaint.

II

The plaintiff also claims that the court improperly determined that no genuine issue of material fact exists as to whether the defendant tortiously interfered with her contractual employment relationship with First Student. We do not agree.

"A claim for tortious interference with contractual relations requires the plaintiff to establish (1) the existence of a contractual or beneficial relationship, (2) the defendants' knowledge of that relationship, (3) the defendants' intent to interfere with the relationship, (4) the interference was tortious, and (5) a loss suffered by the plaintiff was caused by the defendants' tortious conduct." (Internal quotation marks omitted.) *Appleton* v. *Board of Education*, 254 Conn. 205, 212–13, 757 A.2d 1059 (2000). "The plaintiff must satisfy [her] burden of proving each and every element of the claim." *Loiselle* v. *Browning & Browning Real Estate, LLC*, 147 Conn. App. 246, 259–60, 83 A.3d 608 (2013). In its answer to the operative complaint, the defendant admitted that, at all relevant times, it had actual knowledge of the plaintiff's employment relationship with First Student. The record further indicates that the defendant exercised its right under the contract to request that First Student "discontinue the utilization . . . of operators considered unsatisfactory by the Superintendent of Schools . . . ." We therefore focus our analysis on whether the communication of those requests was tortious in nature.

As our Supreme Court has explained, while it "has long recognized a cause of action for tortious interference with contract rights or other business relations . . . [n]ot every act that disturbs a contract or business expectancy is actionable." (Citations omitted.) *Blake* v. *Levy*, 191 Conn. 257, 260, 464 A.2d 52 (1983). "[A] claim is made out [only] when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself." (Internal quotation marks omitted.) Id., 262. Accordingly, "[f]or a plaintiff successfully to prosecute such an action it must prove that the defendant's conduct was in fact tortious. This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the defendant acted maliciously. . . . [A]n action for intentional interference with business rela-

tions . . . requires the plaintiff to plead and prove at least some improper motive or improper means. . . . The plaintiff in a tortious interference claim must demonstrate malice on the part of the defendant, *not in the sense of ill will, but intentional interference without justification.*" (Citations omitted; emphasis added; internal quotation marks omitted.) *Daley* v. *Aetna Life & Casualty Co.*, 249 Conn. 766, 805–806, 734 A.2d 112 (1999).

In *Blake* v. *Levy*, supra, 191 Conn. 257, our Supreme Court expressly rejected a claim that, in actions alleging tortious interference, the defendant bears the burden of proving some justification. As it stated: "[T]his approach incorrectly relegates the central determination of whether the defendant's behavior was improper to an affirmative defense. In an action for intentional interference with business relations we think the better reasoned approach requires the plaintiff to plead and prove at least some improper motive or improper means." Id., 262. For that reason, under Connecticut law, "the employee bears the burden of alleging and proving lack of justification" on the part of the defendant. (Internal quotation marks omitted.) *Daley* v. *Aetna Life & Casualty Co.*, supra, 249 Conn. 806.

Our inquiry into whether the defendant tortiously interfered with the plaintiff's employment relationship without justification is aided by 4 Restatement (Second), Torts § 767 (1979), which delineates certain factors relevant thereto, namely: "(a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties." See *Blake* v. *Levy*, supra, 191 Conn. 263 n.3; *Reyes* v. *Chetta*, 143 Conn. App. 758, 764, 71 A.3d 1255 (2013). Certain factors are closely interwoven with other enumerated factors, and thus "cannot be easily separated." 4 Restatement (Second), supra, § 767, comment (d), p. 33.

The present case is unique, in that the communications by the defendant to First Student were made as part of the exercise of a contractual right to express dissatisfaction to First Student regarding its employee and, ultimately, request the removal thereof. This is, thus, the atypical case in which the actor's conduct arises in the context of a contractual relationship between the actor and the plaintiff's employer. In considering both the actor's motive and the interests in protecting the actor's freedom of action, we note the significant societal interests here implicated. This case concerns the transportation of children to and from school on a daily basis, a quintessential matter of public

safety. Society demands no less than the utmost attention and diligence on the part of public institutions, like the defendant, to properly care for those young citizens in their custody. First Student, in turn, has an interest in maintaining good business relations with customers such as the defendant. First Student also has an interest in obtaining feedback when one of its clients believes that its employees are not performing in a satisfactory manner. By contrast, the plaintiff's contractual interest simply was to continue her employment with First Student. It is undisputed that, subsequent to the defendant's communications with her employer, and its ultimate request that the plaintiff no longer drive routes for its schools, the plaintiff's employment continued with First Student. The plaintiff's employment was neither terminated nor suspended; she merely was reassigned to routes in another municipality and, ultimately, resigned her employment.

The defendant maintains that the affidavits, deposition transcripts and other proof submitted demonstrate that its communications with First Student were justified. Apart from the exclusive prerogative of its superintendent of schools to demand that First Student "discontinue the utilization under this contract of operators considered unsatisfactory" thereby, it remains that those communications were predicated on complaints from parents of the students it serves regarding the plaintiff's conduct as a bus driver. The defendant submits, and the plaintiff does not dispute, that it received complaints that the plaintiff (1) alienated a special education student when assigning seats on her bus, (2) retaliated against another student with a disability, (3) was observed screaming at students on her bus, (4) provided candy to students without their parents' permission, and (5) inquired about providing Christmas gifts to certain parents. It also is undisputed that the plaintiff's conduct with respect to John Doe caused multiple students to become distraught and require counseling with school officials. On another occasion, the plaintiff, while driving students home from Chester Elementary School, may have imperiled the health of a student with a known medical issue by turning the bus around and returning to the school.

The plaintiff's allegation of improper motive on the part of the defendant further is undermined by the undisputed fact that when Levy requested the plaintiff's removal from the Chester Elementary School route during the 2010–2011 school year, she did not request her removal from her kindergarten run in Essex, which the plaintiff continued to drive for the remainder of the school year. Similarly, when Levy requested the plaintiff's removal from the Essex Elementary School route in November of the 2011–2012 school year, she did not request her removal from a kindergarten run in Essex. Rather, the plaintiff continued to drive her kindergarten run with the defendant until December, 2011, at which

time the plaintiff, contrary to the admonitions of her employer, appeared at the committee meeting and requested an investigation into Levy's decision to exercise the defendant's contractual right to remove her from the elementary school route.

Our appellate courts have affirmed decisions granting summary judgment or directing a verdict on claims alleging tortious interference with an employment contract when the evidence was insufficient to support a finding that the defendant engaged in intentional and wrongful conduct without justification. See, e.g., *Daley* v. *Aetna Life & Casualty Co.*, supra, 249 Conn. 807–808 (court properly directed verdict on tortious interference claim when evidence substantiated "legitimate justification for the adverse employment action" and defendant's actions "can be justified . . . as a matter of employer prerogative"); *Kakadelis* v. *DeFabritis*, 191 Conn. 276, 280, 464 A.2d 57 (1983) (summary judgment proper when "[t]he affidavits which are the basis for the summary judgment . . . indicate no wrongful conduct on the part of either defendant"); *Downes-Patterson Corp.* v. *First National Supermarkets, Inc.*, 64 Conn. App. 417, 430, 780 A.2d 967 (court properly set aside verdict when "the evidence submitted by the plaintiffs to prove the defendant's tortious interference . . . was lacking"), cert. granted, 258 Conn. 917, 782 A.2d 1242 (2001) (appeal dismissed June 25, 2002); *PAR Painting, Inc.* v. *Greenhorne & O'Mara, Inc.*, 61 Conn. App. 317, 326, 763 A.2d 1078 (court properly set aside verdict when evidence insufficient "to show that the defendants acted with improper motive, an essential element of proving tortious interference with a business relationship"), cert. denied, 255 Conn. 951, 770 A.2d 31 (2001); *Rotophone, Inc.* v. *Danbury Hospital*, 13 Conn. App. 230, 235, 535 A.2d 830 (1988) (summary judgment proper because "the plaintiffs failed to demonstrate in their affidavits or evidence that there was a genuine issue of material fact to be decided or that, as a matter of law, the defendant had used any improper means or motive").

The plaintiff's action in the present case suffers a similar infirmity. As in *Daley* v. *Aetna Life & Casualty Co.*, supra, 249 Conn. 807, the defendant's communications to First Student regarding the plaintiff's conduct were justified as a matter of employer prerogative. First Student chose to enter into a contract with the defendant that afforded the defendant the right to inform First Student whenever the performance of one of its bus drivers was deemed unsatisfactory by the defendant's schools superintendent. The scope of that contractual right conferred on the defendant is sweeping, as it permits the defendant to demand the removal of bus drivers "considered unsatisfactory by the Superintendent of Schools . . . ." The broad nature of that contractual right is understandable in light of the significant societal interests already addressed in this deci-

sion, and furnishes a legitimate justification for the defendant's communications to First Student.

In her operative complaint, the plaintiff alleged that the defendant provided an "explicit direction" to First Student to threaten "disciplinary action, including termination" against the plaintiff. In opposing the motion for summary judgment, the plaintiff has provided no evidence to substantiate that allegation. Rather, the affidavits, deposition transcripts and other proof submitted establish merely that the defendant informed First Student of its concerns regarding the plaintiff's unsatisfactory performance. As Levy stated during her deposition testimony, although the defendant possessed a contractual right "to say that it's not working, and we would like to have [a] driver removed," that "is in no way saying that [the driver] would be reprimanded or lose their job in any way whatsoever because First Student has other districts that they drive for." Furthermore, the record before us indicates that Levy simply articulated the defendant's dissatisfaction with the plaintiff's performance as a bus driver; she did not discuss any action that First Student should take with respect to the plaintiff's employment apart from her removal from routes with the defendant. As Levy admitted in her deposition, "that certainly [would not] be my place to do so."

In the context of tortious interference claims, "[c]onclusory allegations of improper motivation are not sufficient . . . ." *Metcoff* v. *Lebovics*, 123 Conn. App. 512, 523, 2 A.3d 942 (2010). The affidavits, deposition transcripts and other proof submitted demonstrate that the defendant possessed a legitimate justification for its communications with First Student regarding the plaintiff's conduct. It was concerned about the plaintiff's fitness as a bus driver due to, inter alia, multiple issues involving special education students, numerous complaints from parents on a variety of issues, the plaintiff's conduct in screaming at children on her bus, the fact that some students on her bus required counseling after becoming distraught over the plaintiff's employment status, and the plaintiff's refusal to comply with the team's request to make verbal, rather than written, reports of incidents involving a special education student. Moreover, the decision to communicate such concerns—as well as the exercise of the contractual right of removal from routes—remained the exclusive prerogative of the defendant under the contract.

Construing the record before us in a light most favorable thereto, the plaintiff cannot establish that the defendant's communications with First Student constituted "intentional interference without justification." (Internal quotation marks omitted.) *Daley* v. *Aetna Life & Casualty Co.*, supra, 249 Conn. 806. We therefore agree with the court that no genuine issue of material fact exists as to whether the defendant's communica-

tions with First Student were tortious in nature.[16]

The judgment is affirmed.

In this opinion the other judges concurred.

[1] In her original complaint, the plaintiff also named First Student, Inc., and First Student Management, LLC, as defendants. Following a settlement, the action against those entities was withdrawn, and they are not parties to this appeal. We therefore refer in this opinion to Regional School District 4 as the defendant.

[2] Kulick subsequently received a written request from Ruth I. Levy, the defendant's superintendent of schools, asking that the plaintiff "be removed from [her route] in Chester due to 'unsatisfactory performance of bus driving duties,' per the contract between [the defendant] and First Student." Levy did not request the plaintiff's removal from her kindergarten run in Essex, which the plaintiff continued to drive without incident during the 2010–2011 school year.

[3] In her deposition testimony, Joanne Beekley, the principal of Essex Elementary School, averred that at least one-half dozen parents contacted the school in the fall of 2011 regarding John Doe's behavior on the plaintiff's bus route.

[4] The guardian believed that the plaintiff's written reports were retaliatory against the child due to their frequency. Beekley testified at her deposition that she believed "the reports were accurate of what was happening on the bus but detrimental to trying to solve the problem."

[5] Beekley testified that she spoke with John Doe's guardian "[o]n a weekly basis, minimum." She and the team "had a scheduled meeting on a weekly basis, and [they] would call in between with issues."

[6] Some students on the plaintiff's bus route were "concerned and worried" that the plaintiff "was going to be fired from her job because of John Doe . . . ." As a result, those students wrote letters and met with school counselors because they "felt they needed to help" her. Beekley testified at her deposition that she "felt it was an unsafe situation for students to be part of, emotionally."

[7] Beekley received complaints from three parents about the plaintiff providing candy to their children without the parents' permission.

[8] Beekley received a complaint from a parent who was "upset" and "concerned" about the plaintiff's inquiry regarding Christmas gifts.

[9] The plaintiff thereafter continued to drive a kindergarten run in Essex.

[10] Ivoryton is a village in Connecticut. The villages of Ivoryton, Essex and Centerbrook together constitute the municipality of Essex. See http://www.essexhistory.org/history-of-essex-ct.htm (last visited July 1, 2015).

[11] As Levy recounted during her deposition testimony:

"[The Plaintiff's Attorney]: Did you speak to [Kulick] after the February 28, 2012 [committee] meeting about [the plaintiff] attending the meeting?

"[Levy]: I did once again let him know that she attended the meeting and was still uncomfortable with the employment situation.

"[The Plaintiff's Attorney]: What did [Kulick] say?

"[Levy]: That he would handle it [as] her supervisor.

"[The Plaintiff's Attorney]: And did you discuss with him any action that should or would be taken with respect to [the plaintiff] because of her attendance at that meeting?

"[Levy]: No. And that wouldn't certainly be my place to do so.

"[The Plaintiff's Attorney]: Why did you feel obligated to call [Kulick] about her attendance at the meeting?

"[Levy]: Simply to just let him know that his employee was unhappy and maybe he can address that with her."

[12] The following colloquy transpired during the plaintiff's deposition:

"[The Defendant's Attorney]: And so you just quit?

"[The Plaintiff]: Yes.

"[The Defendant's Attorney]: Voluntarily?

"[The Plaintiff]: Correct."

[13] The plaintiff testified: "By April [of 2012], they are asking me to assign seats or to write up a student, and it just got to the point where I couldn't do my job anymore because I never knew what was right or what was wrong. And I was just, like, I'm just going to get fired at some point because someone is going to be unhappy with what I do. So, I just couldn't do the job anymore. And I didn't feel like I could do it correctly anymore. . . . If they told me to assign seats, I would say, well, I was told it was illegal, and they would look at me like I had eight heads. Or if they told me that they need me to write up a student, I would be, like, well, I'm not sure what to do, let me talk to my supervisor. And they would be, like, no, it's mandated

you have to report incidents on the bus. So, I would talk to Madeline [Tucker, a First Student employee who supervised the plaintiff's work in Clinton] about my concerns, and she's, like, well, you have to, that's part of First Student; you know what the rules are.''

[14] It is not hard to imagine a scenario in which an employee, under the plaintiff's proposed construction of § 31-51q, is subject to countless employers. As but one example, consider the employee who is employed by a residential landscaping company that contracts to mow dozens of lawns on a weekly basis.

[15] Because we conclude that no genuine issue of material fact exists as to whether the defendant was the plaintiff's employer under § 31-51q, we need not consider whether such an issue exists as to whether the plaintiff engaged in constitutionally protected speech.

[16] In moving for summary judgment, the defendant also argued that no genuine issue of material fact exists as to whether its communications with First Student affected the plaintiff's employment status. "Unlike other torts in which liability gives rise to nominal damages even in the absence of proof of actual loss . . . it is an essential element of the tort of unlawful interference with business relations that the plaintiff suffers actual loss. . . . Therefore, in order to survive a motion for summary judgment the plaintiff must allege an actual loss resulting from the improper interference with her contract.'' (Citation omitted; internal quotation marks omitted.) *Appleton* v. *Board of Education*, supra, 254 Conn. 213. Because we conclude that no genuine issue of material fact exists as to whether the defendant's communications with First Student were tortious, we need not consider the question of whether those communications caused the plaintiff to suffer an actual loss.