2022 IL App (1st) 220590-U

No. 1-22-0590

Order filed December 28, 2022

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| DAVID D'ADDARIO, Individually, as Co-Executor of the Estate of F. Francis D'Addario, and as Co-Trustee of the David D'Addario Spray Trust No. 1, the David D'Addario Spray Trust No. 2 and the David D'Addario Accumulation Trust; MARYLOU D'ADDARIO, Individually and as Co-Trustee of the Marylou D'Addario Spray Trust No. 1, the Marylou D'Addario Spray Trust No. 2 and the Marylou D'Addario Accumulation Trust; and NICHOLAS VITTI, as Co-Trustee of the David D'Addario Spray Trust No. 1, the David D'Addario Spray Trust No. 2, the David D'Addario Accumulation Trust, the Marylou D'Addario Spray Trust No. 1, the Marylou D'Addario Spray Trust No. 2 and the Marylou D'Addario Accumulation Trust, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Appeal from the Circuit Court of Cook County |
| | ) | No. 19 L 14295 |
| Plaintiffs, | ) ) | |
| (David D'Addario, Individually, as Co-Executor of the Estate of F. Francis D'Addario, and as Co-Trustee of the David D'Addario Spray Trust No. 1, the David D'Addario Spray Trust No. 2 and the David D'Addario Accumulation Trust, Plaintiff and Counterdefendant-Appellant; Marylou D'Addario, Individually and as Co-Trustee of the Marylou D'Addario Spray Trust No. 1, the Marylou D'Addario Spray Trust No. 2 and the Marylou D'Addario Accumulation Trust and Nicholas Vitti, as Co-Trustee of | ) ) ) ) ) ) ) ) ) ) ) | Honorable Michael F. Otto, Judge presiding. |

No. 1-22-0590

the David D'Addario Spray Trust No. 1, the David )
D'Addario Spray Trust No. 2, the David D'Addario )
Accumulation Trust, the Marylou D'Addario Spray Trust )
No. 1, the Marylou D'Addario Spray Trust No. 2 and the )
Marylou D'Addario Accumulation Trust, Plaintiffs- )
Appellants) )
  )
     v. )
  )
VIRGINIA A. D'ADDARIO, Individually, and BRENT )
PLATT, Individually and as Trustee of the Virginia )
D'Addario Spray Trust No. 1, Virginia D'Addario Spray )
Trust No. 2 and the Virginia D'Addario Accumulation )
Trust, )
  )
    Defendants, )
  )
(Virginia A. D'Addario, Individually, Defendant and )
Counterplaintiff-Appellee; and Brent Platt, Individually )
and as Trustee of the Virginia D'Addario Spray Trust No. )
1, Virginia D'Addario Spray Trust No. 2 and the Virginia )
D'Addario Accumulation Trust, Defendant-Appellee). )

---

JUSTICE BURKE delivered the judgment of the court.
Presiding Justice McBride and Justice D.B. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm the circuit court's rulings on the parties' cross-motions for summary judgment, which denied summary judgment to plaintiffs and granted summary judgment to defendants, where plaintiffs could not prove essential elements of their causes of action for breach of contract and tortious interference with prospective economic advantage.

¶ 2    In 1987, after F. Francis D'Addario (Francis) passed away, his estate (the Estate) came to an agreement with his daughter, Virginia D'Addario (Virginia), to acquire her bank debt and provide her a cash advance from what she otherwise would receive from the Estate once it closed. In exchange, Virginia agreed not to participate, or take part, in deliberations or decisions of the

- 2 -

Estate regarding the Estate or its property. Around this time, the Estate owned a 50% interest in properties that were leased to Tilcon Connecticut, Inc. (Tilcon) for use as asphalt plants. The remaining ownership interest in the properties were held by the trusts of Francis' four living children, including Virginia, equally. Years later, the Estate and the trusts of Virginia's siblings all agreed to sell the properties to Tilcon, but Virginia would not sell her ownership interest unless she was compensated directly at closing rather than as a beneficiary of the Estate once it closed and through her trusts. The Estate refused to accommodate Virginia's request, and in turn, Virginia refused to allow her trusts to consent to the sale. As a result, the sale with Tilcon fell through.

¶ 3     In light of the transaction falling through, the co-executor of the Estate as well as the co-trustees of two of Virginia's siblings' trusts sued Virginia and the trustee of her trusts for breach of the 1987 agreement and intentional interference with prospective economic advantage. On cross-motions for summary judgment, the circuit court granted defendants' motion and denied plaintiffs' motion. Plaintiffs now appeal the court's summary judgment rulings and contend that the court should have granted their motion and denied defendants' motion. For the reasons that follow, we affirm the circuit court's judgment.

¶ 4                                    I. BACKGROUND

¶ 5                          A. Francis' Estate and the 1987 Agreement

¶ 6     Francis was a successful businessman. In the mid-1970s, in order to protect his wealth, he created two spray trusts and one accumulation trust for each of his five children—Virginia, Lawrence D'Addario (Larry), Marylou D'Addario (Marylou), Lisa D'Addario (Lisa) and David D'Addario (David)—and their descendants.[1] Among other provisions, the trusts stated that "[i]t is

_____

[1] A spray trust, also known as a sprinkling trust, is a trust where the settlor provides the trustee with great discretion in making distributions to the beneficiaries as opposed to a trust where the terms of the

the fond hope of [Francis] that the needs of said [beneficiary] will be considered first and foremost." Several years later, Francis created a will, which bequeathed his estate to a revocable trust. Under that trust, the vast majority of the Estate's assets were to be split between a marital trust for the benefit of his wife, Ann, and separate trusts for Francis' children. In 1986, Francis passed away, and his will was admitted to probate in Connecticut state court.

¶ 7    By 1987, Virginia and her then-husband were involved in bankruptcy proceedings in federal court in Connecticut based, in part, on being indebted to multiple banks for approximately $2.5 million. Virginia informed Ann, her siblings, the executors of the Estate and the trustees of Francis' trust that her assets might be insufficient to discharge her indebtedness to the banks and her other creditors. Ann and Virginia's siblings believed that the continuation of Virginia's bankruptcy case and the resulting potential loss of Virginia's assets would impair the general credit standing of the D'Addario family, individually and collectively. To remedy this concern, Ann and Virginia's siblings requested the then-executors of the Estate and the then-trustees of Francis' trust to undertake steps to prevent the loss of such credit standing and to permit Virginia to be discharged from further bankruptcy proceedings. To this end, Virginia, the Estate and the rest of the interested parties entered into a court-approved agreement, which was to be governed by Connecticut law. Under the agreement, the Estate assumed Virginia's liabilities to the banks and advanced her $1.4 million, both to be credited against amounts she would otherwise later receive from the Estate when it closed. In exchange, Virginia agreed to several conditions, including that

---

instrument define the manner in which the income and principal will be distributed with great specificity. 19 Robert S. Hunter, Illinois Practice Series, Estate Planning and Administration § 228:18 (4th ed. 2007). An "accumulation trust is not a kind of trust which is entirely distinct from any other kind of trust," but "[r]ather, it is any trust in which the trustee is authorized or directed to accumulate income over a period of time, rather than distribute it periodically." 19 Robert S. Hunter, Illinois Practice Series, Estate Planning and Administration § 220:11 (4th ed. 2007).

she would "not be entitled to and will not participate in or take part in Estate deliberations or decisions as regards the Estate or its property." Meanwhile, the Estate also had an obligation to "furnish[ ] to counsel appointed by Virginia" periodically "[m]aterial data involving the Estate." Pursuant to the agreement, Virginia executed an interest-bearing promissory note for $3.9 million to reimburse the Estate for the advance and assumption of liabilities, which would be paid from any distribution she would receive from the Estate once it closed. When the Estate assumed Virginia's bank liabilities, it apparently was able to do so for 10 cents on the dollar.

¶ 8    In 1990, Lisa passed away, and in 2014, Ann passed away. Throughout the years, the Estate never closed. And the Estate continued to own various illiquid assets, including businesses and real estate, some of which were co-owned by the trusts of Francis' living children. As a consequence of the Estate remaining open, none of the Estate's assets have been distributed to Francis' trust. Further, due to Lisa and Ann's passing, each of Francis' living children—Virginia, David, Larry and Marylou—have effectively a 25% beneficiary interest in the Estate.

¶ 9                              B. The Tilcon Properties

¶ 10    Since the mid-1970s, Francis leased properties he owned in Connecticut to initially Ashland Oil, Inc. (Ashland) and then its successor-in-interest, Tilcon, who used the land as an asphalt plant and related operations. Before Francis passed away, he transferred a 50% interest in the parcels of land to his children's trusts in equal shares. When Francis passed away, his remaining 50% interest in the parcels of land passed on to his Estate. When Lisa passed away without having any children, her interest vested in her siblings' trusts equally, resulting in Virginia, David, Larry and Marylou's trusts each owning 12.5% of the properties.

¶ 11    The initial leases between Francis and Ashland was for 20 years and provided three options to extend the leases by an additional 10 years each. The leases further provided that, upon

completion of the initial term or any extensions, Ashland was obligated to purchase the parcels of land, including the structures and improvements thereon, for the fair market value of the land based on the average of three separate appraisals. This obligation existed unless Ashland terminated the leases in accordance with the termination provisions.

¶ 12    As the initial 20-year leases were nearing completion, Tilcon, as the successor-in-interest to Ashland, the executors of the Estate, and the trustees of David, Larry and Marylou's trusts all agreed to amended leases. However, the trustees of Virginia's trusts refused to consent to the amended leases. In order to avoid losing rental income from Tilcon, the executors of the Estate, and the trustees of David, Larry and Marylou's trusts heeded Tilcon's request to indemnify it against any suit brought by Virginia or her trusts. In the amended leases, the amount of rent that Tilcon owed was based on a complex formula that included annual sales as a component.

¶ 13    Over the next several years, Virginia directed the trustees of her trusts to file various lawsuits against Tilcon. In one lawsuit, Virginia sought a forced sale of the properties. Although Tilcon won the first lawsuit, the Estate had to indemnify Tilcon for the costs of the litigation. In a second lawsuit, Virginia sought back rent of $1 million that she alleged she was owed. Virginia lost this second lawsuit, including an appeal, but the Estate had to indemnify Tilcon for the costs of the litigation. In addition to the lawsuits against Tilcon, Virginia sued David, as the co-executor of the Estate, amongst others, for various claims, including mismanagement of the Estate and misappropriation of money in both state and federal court in Connecticut. In federal court, Virginia claimed that David had concocted a long-term plan "to plunder, pillage and loot the over $162,000,000 in assets of [the Estate]." Virginia further alleged that:

> "Rather than honor and uphold his charge as executor to administer and settle the
> affairs of [the Estate] in a prompt and efficient manner, David ran the Estate as his

personal fiefdom, deliberately keeping the Estate open \*\*\*, some 33 years later, [while] most of the Estate's major assets have been transferred for the financial benefit of David and his co-conspirators, with the Estate left virtually insolvent in his wake."

¶ 14    Turning back to the leases with Tilcon, it exercised the remaining two 10-year options, resulting in the leases on the properties terminating on December 31, 2024, at which point, based on the terms of the leases, Tilcon would be obligated to purchase the properties.

¶ 15    In 2016, the Estate, David, Larry and Marylou's trusts, and the Irish-based parent company of Tilcon, Oldcastle Materials, Inc., (hereinafter referred to collectively as "Tilcon") began negotiations for Tilcon to buy the properties. Based on an indication-of-interest letter between the Tilcon and Nicholas Vitti, who was the co-trustee of David's three trusts and Marylou's three trusts, Tilcon tentatively agreed to buy the properties for $16.9 million. Part of the purchase price would come from a cash payment at closing and part of the purchase price would come from yearly payments over the course of several years. The letter noted that there were several conditions to consummating the transaction, including the approval of the executors of the Estate, who at the time were Larry and David, and the trustees of the siblings' various trusts. Additionally, the letter stated that it was "a non-binding indication of interest only" and that "[n]o party shall have any liability to any other party for rejection or withdrawal of this indication of interest or, if for whatever reason or for no reason, the parties fail to complete the contemplated transaction." Although the Estate and David, Larry and Marylou's trusts agreed to the deal, Virginia's trusts did not and the deal fell through. According to the deposition of Gary Wall, Tilcon's corporative representative who was involved in the negotiations, part of the reason the deal fell through was

because Tilcon wanted Virginia to drop her back rent lawsuit, which was pending at the time, against the company.

¶ 16    Three years later, the executors of the Estate, the trustees of David, Larry and Marylou's trusts, and Tilcon renewed negotiations for Tilcon to buy the properties and again agreed on a sale price of $16.9 million. According to Wall, Tilcon was going to purchase the properties based on the terms reflected in the 2016 indication-of-interest letter. Tilcon, however, conditioned its agreement on Virginia dismissing the appeal, which was pending at the time, of her back rent lawsuit.

¶ 17    In May 2019, Robert Ericson, an attorney and representative of the Estate, e-mailed Dean Armstrong, an Illinois-based attorney, who represented Virginia and her trusts. Ericson asserted that Virginia was aware the funds from the proposed Tilcon transaction would pay for the Estate's administrative expenses and finally allow the Estate to close, a concern that Virginia had. Armstrong responded, disputing that either he or Virginia knew this information. Armstrong requested that Ericson "explain the basis for [his] claim" and provide "the amount of the outstanding [E]state administrative expenses, along with all supporting documentation." Additionally, Armstrong stated that, because Virginia had not been consulted in any manner in connection with the negotiations over the proposed terms of the Tilcon transaction, it would be in everyone's best interest to have Brent Platt, the sole trustee of Virginia's trusts, participate in a conference call with Tilcon about the proposed sale, in particular to "increase the amount of upfront money, and increase the amount of the annual payments." Armstrong indicated that Virginia was willing to proceed with the transaction as currently outlined except that she would not withdraw her appeal in the Tilcon back rent litigation without a fair and equitable resolution to that case.

¶ 18    The following month, Ericson sent Armstrong an e-mail detailing the final payment terms of the proposed transaction with Tilcon. Although the price would be $16.9 million, there would be a cash down payment of $6.75 million with the remaining amounts being paid out over the next several years. According to Ericson's e-mail, the executors of the Estate and the trustees of David, Larry and Marylou's trusts had agreed to the terms, and further, Tilcon had agreed that it would drop its condition of acceptance that Virginia abandon her back rent appeal. Ericson noted that the Estate would continue to indemnify Tilcon for its litigation expenses. Ericson stated that, due to the complex nature of Tilcon's ownership, ultimately by the Irish-based parent company, there was no ability to change the terms of the proposed transaction.

¶ 19    In July 2019, Armstrong sent Ericson a letter highlighting Virginia's belief that the Estate had been grossly mismanaged by David. Armstrong noted his previous request for the amount of the outstanding administrative expenses of the Estate along with all supporting documentation, but asserted that he had not received any information. Armstrong stated that this failure furthered Virginia's belief that David was mismanaging the Estate and exemplified Virginia's worry that any money passing into the Estate in the proposed Tilcon transaction would ever flow back out to her as one of the Estate's beneficiaries. As a result, Armstrong informed Ericson that Virginia would not consent to the proposed transaction:

> "[w]hich requires her portion of the sale proceeds of the Asphalt Plants to go into the probate estate, which may (or, as history teaches us, probably won't) flow back out to her benefit. Accordingly, Virginia will only agree to a deal which provides for the full payment of her portion of the net sale proceeds (25%) at the time of the closing."

According to a deposition of Virginia, she believed the sales price was fair, but did not agree with how she ultimately would be compensated from the transaction, which is why she requested her share be paid to her directly at closing. Further, according to an affidavit by certification from Virginia and Platt filed in the circuit court in the instant case, her refusal to allow her trusts to agree to the sale "was not based on a desire to harm" her siblings or the Estate, but rather her "concern[ ] that any proceeds from" the proposed sale that would go into the Estate would ever "come out to the benefit of [her] or [her] [t]rusts."

¶ 20    Although Virginia made her demands, Ericson did not believe the Estate or the trusts of David, Marylou and Larry could oblige them. In a deposition, Ericson testified that Virginia's demands could not be accommodated because of the fiduciary duties the trustees of the various trusts had to the trusts' beneficiaries and the fiduciary duties the executors of the Estate had to the Estate's beneficiaries. Ericson believed that David and Larry, as the executors of the Estate, would have breached their fiduciary duties if they "identif[ied] one particular beneficiary of the Estate," *i.e.*, Virginia, "and favor[ed] her over the other beneficiaries and the other stakeholders in the Estate." Ericson further testified that Virginia's demands for "special treatment" were curious given she was "indebted to the Estate for millions of dollars." As a result, the executors of the Estate and the trustees of David, Marylou and Larry's trusts rejected Virginia's demands. Ultimately, Tilcon withdrew from the negotiations.

¶ 21                          C. The Instant Litigation

¶ 22    In December 2019, as a result of the proposed Tilcon transaction falling through, David, individually, as co-executor of the Estate and as co-trustee of his own three trusts, Marylou, individually and co-trustee of her three trusts, and Vitti, as co-trustee of David's three trusts and Marylou's three trusts (collectively, plaintiffs), filed a three-count complaint against Virginia and

Platt, in their individual capacity and as co-trustees of Virginia's trusts (collectively, defendants). Larry, the other co-executor of the Estate, was not a party to the complaint, but he did authorize David to file the lawsuit on behalf of the Estate. Plaintiffs brought claims for Virginia breaching the 1987 agreement, defendants intentionally interfering with a prospective economic advantage and defendants breaching their fiduciary duties to David and Marylou, as vested remainder beneficiaries of Virginia's trusts.

¶ 23    In response, defendants filed an answer and affirmative defenses. Separately, Virginia filed five counterclaims, which she later amended. Her amended pleading contained multiple counterclaims against David and a breach of contract counterclaim against the Estate. In that counterclaim, Virginia highlighted that, as part of the 1987 agreement, her appointed counsel was entitled to receive material data involving the Estate periodically. Virginia asserted that David, as the co-executor of the Estate, had failed to provide such material information and thus, the Estate had breached the agreement with Virginia. Thereafter, upon David filing a motion to dismiss and an agreed dismissal order between the parties, the circuit court dismissed all five of Virginia's counterclaims without prejudice. The parties agreed that Virginia's first four counterclaims should be dismissed based on litigation Virginia brought against David, among others, proceeding in both state and federal court in Connecticut. Separately, the court dismissed Virginia's breach of contract counterclaim, finding, in part, that Virginia insufficiently pled the counterclaim because the 1987 agreement contemplated the appointment of counsel by Virginia and the notification of that appointment to David, as the co-executor of the Estate. The court observed that Virginia failed to allege she notified David of her appointed counsel, and thus, her counterclaim, as presently alleged, could not stand.

¶ 24    Virginia later amended her breach of contract counterclaim and styled it as a single-count counterclaim for declaratory judgment. Therein, she sought a declaration of her right under the 1987 agreement to receive, through her counsel, material data involving the Estate periodically without an affirmative request by her counsel for such information. Moreover, she sought a declaration that the failure to do so by David and the Estate constituted a material breach of the 1987 agreement. On David's motion to dismiss, the circuit court dismissed the counterclaim for declaratory judgment finding, in part, that "there still [were] no well-plead facts that Virginia ever designated an attorney to receive the information."

¶ 25    In June 2021, plaintiffs filed an amended six-count complaint. In the amended complaint, in contrast to the initial complaint, Virginia was no longer sued as a co-trustee of her trusts because Platt was the sole trustee of those trusts. Only Counts I and II are relevant for this appeal, and they are the only two counts that will be discussed in depth. Count I was brought by David, as co-executor of the Estate, and he alleged a breach of contract against Virginia, in her individual capacity. David asserted that, while the Estate satisfied its obligations under the 1987 agreement, Virginia failed to uphold her obligations in various manners, including by interfering and blocking the sale of the Tilcon properties. As a result of Virginia allegedly breaching the agreement, David claimed that the Estate suffered "at least $8,450,000 in damages" based on its ownership interest in the properties and "at least $6,630,000" consisting "of $3,900,000 advanced from the Estate under the terms of the [1987] [a]greement plus statutory prejudgment interest from March of 2014 of at least $2,730,000." In the alternative, David asserted that the Estate sought rescission of the 1987 agreement as well as incidental damages and restitution "of at least $17,160,000" consisting "of $3,900,000 advanced from the Estate under the terms of the [1987] [a]greement plus statutory prejudgment interest from November 1987 of at least $13,260,000."

¶ 26    Count II was brought by David, as co-executor of the Estate and as co-trustee of his trusts, Marylou, as co-trustee of her trusts, and Vitti, as co-trustee of David and Marylou's trusts, and they alleged an intentional interference with prospective economic advantage against Virginia, individually, and Platt, individually and as co-trustee of Virginia's trusts. Plaintiffs claimed that, in 2019, the Estate and David and Marylou's trusts had an expectancy of entering into a contract with Tilcon for the sale of the Tilcon properties. Plaintiffs further alleged that Virginia and Platt had actual knowledge of the business relationship and expected transaction with Tilcon. Despite this claimed knowledge, plaintiffs asserted that Virginia and Platt interfered with the expectancy of the Estate, and David and Marylou's trusts by attempting to divert proceeds from the sale of Tilcon properties and ultimately blocking the sale of the properties. Plaintiffs posited that these actions were conducted with the improper motive of interfering with the administration of the Estate and with the intent to cause harm to the Estate, and David and Marylou's trusts. Plaintiffs stated that, but for Virginia and Platt's wrongful conduct, Tilcon would have purchased the properties for $16.9 million. According to plaintiffs, as a result of Virginia and Platt's tortious interference, the Estate suffered actual damages of at least $8,450,000, and David and Marylou's trusts suffered actual damages of at least $2,112,500 from the "lost proceeds" of the sale of the Tilcon properties.

¶ 27    Count III was brought by David and Marylou in their individual capacities against Platt, as trustee of Virginia's trusts, for breach of fiduciary duty. Count IV and Count V were brought by David, in his individual capacity, against Virginia, in her individual capacity, for defamation *per se*. Lastly, Count VI was brought by Marylou, in her individual capacity, against Virginia, in her individual capacity, for defamation *per se*.

¶ 28    In response, defendants filed their answer and affirmative defenses to Counts I through III. In their answer, Virginia acknowledged signing the 1987 agreement and that the Estate made a cash advance to her as well as assumed her bank debts. Virginia, however, denied that she breached the agreement, and defendants denied that they intentionally interfered with a prospective economic advantage. As a defense to Count I, Virginia alleged that David's breach of contract claim was barred by the Estate's prior breach in failing to provide material data to Virginia's counsel on a periodic basis, as required by the 1987 agreement. As a defense to Count II, defendants noted that Virginia's trusts held a 12.5% interest in the Tilcon properties, and thus, her trusts were under no obligation to sell their interests upon terms and conditions they deemed unsatisfactory.

¶ 29    In July 2021, plaintiffs filed a motion for partial summary judgment on the issue of liability for Counts I, II and III of their amended complaint. As relevant to Count I, David posited that the 1987 agreement was a valid contract, and the Estate performed its obligations under the agreement by assuming Virginia's bank debt and providing her the cash advance. Although David highlighted Virginia's affirmative defense that the Estate breached the agreement by failing to furnish material data to her appointed counsel, David asserted that Virginia never appointed anyone to receive such information, as the circuit court found when dismissing her counterclaim. David argued that Virginia breached the 1987 agreement by blocking the $16.9 million sale of the Tilcon properties by demanding that he and Larry, as the executors of the Estate, breach their fiduciary duties and make a preferential payment to her from the Estate's proceeds. Lastly, David asserted that, as a result of Virginia's breach, the Estate incurred significant damage based on the millions of dollars in lost proceeds. As relevant to Count II, plaintiffs argued that they had a reasonable expectation of entering into a business relationship with Tilcon and that defendants knew of this expectancy.

Plaintiffs posited that defendants intentionally and unjustifiably interfered with their business expectancy by refusing to consent to the sale unless Virginia received a preferential payment at closing. Plaintiffs contended that they were damaged by defendants' interference because they were deprived of the sale proceeds, Tilcon was no longer willing to purchase the properties and they were not permitted to sell the properties to any other buyer based on the terms of the leases.

¶ 30    Thereafter, defendants filed a combined response to plaintiffs' motion for partial summary judgment and their own cross-motion for summary judgment on Counts I, II and III. In relevant part, Virginia argued that, because her trusts owned 12.5% of the Tilcon properties, the trusts had the right to make any decision they wanted to make concerning the potential sale and did not participate, or take part, in any deliberations or decisions of the Estate concerning its property by doing so. Additionally, Virginia claimed that David failed to prove he suffered any damages because the Estate not receiving proceeds from the sale was not sufficient proof of damages. Virginia noted that Tilcon was obligated to purchase the land following the termination of the current leases, so even if Tilcon did not want to purchase the land presently, Tilcon would be obligated to in 2024 when the fair market value of the land could be worth more than it was presently. Virginia further argued that David failed to prove the Estate complied with the 1987 agreement's requirement to furnish her counsel material data concerning the Estate, and thus, prior to her alleged breach, the Estate breached the agreement. Concerning Count II, defendants raised several reasons why plaintiffs' tortious interference claim could not succeed, including that their alleged interference was not directed at Tilcon, as a third party, which was required in such a claim. Based on their arguments, defendants contended that plaintiffs' partial motion for summary judgment should be denied and their own cross-motion for summary judgment should be granted.

¶ 31    Plaintiffs subsequently filed a combined reply in support of their motion for partial summary judgment and a response to defendants' cross-motion for summary judgment. Of note, David posited that nominal damages as well as equitable relief, such as recission, were both appropriate remedies in a breach of contract claim. In turn, defendants filed a reply in support of their cross-motion for summary judgment. While the parties were briefing their cross-motions for summary judgment, the circuit court granted Virginia's motion to dismiss Counts IV, V and VI of plaintiffs' amended complaint. As a result of this dismissal order and the previous dismissal orders, the only claims remaining in the litigation were Counts I, II and III of plaintiffs' amended complaint.

¶ 32    In December 2021, the circuit court issued a memorandum opinion and order. Concerning Count I, the court addressed some of the various manners David alleged how Virginia breached the 1987 agreement, but did not specifically address David's claim that Virginia breached the agreement by blocking the sale of the Tilcon properties. In doing so, the court concluded that Virginia was entitled to summary judgment because David failed to adduce any evidence of damages. Concerning Count II, the court noted that defendants' demand for a modified manner of compensation was "clearly not directed" at Tilcon and thus, could not constitute intentional interference with prospective economic advantage. Moreover, the court observed that, to the extent Virginia's trusts refusal to agree to sell could be construed as directed at Tilcon, her trusts had the legal right to refuse to sell given their ownership interest. To this end, the court found that, to the extent defendants' conduct could be considered wrongful, that conduct was not directed at a third party, and to the extent defendants' conduct was directed at a third party, that conduct was not wrongful. Concerning Count III, the court found the evidence failed to show that Platt had breached his fiduciary duty. Consequently, the circuit court denied plaintiffs' motion for partial

summary judgment on the issue of liability and granted defendants' cross-motion for summary judgment.

¶ 33    Thereafter, David filed a motion to reconsider on Count I. Initially, David asserted that the court's memorandum opinion and order did not address his claim that Virginia breached the 1987 agreement by blocking the sale of the Tilcon properties and instead addressed other alleged breaches of the agreement. David once again argued that he proved all the elements necessary to sustain a breach of contract claim based on Virginia blocking the sale of the Tilcon properties. Moreover, concerning the damages aspect of Count I, David posited that he only needed to show the fact a harm occurred as opposed to showing the degree of the harm, and based on the undisputed evidence, Virginia caused harm to the Estate by blocking the sale of the Tilcon properties. David highlighted that multiple witnesses testified during depositions that the Tilcon properties were worth substantially less presently than they were worth in 2019 when the parties (minus Virginia's trusts) agreed to the $16.9 million sales price. Although David pointed out that the court closed fact discovery, he observed that the court deferred the question of expert discovery until after the hearing on the parties' cross-motions for summary judgment. According to a transcript in the record, the court did so because "the issues [may be] narrowed" or the case may be "resolved one way or the other, in whole or in part" depending on how it ruled on the pending cross-motions for summary judgment. To this end, David argued that the precise amount of damages should be addressed through expert disclosures and discovery in a schedule set by the court.

¶ 34    In April 2022, following briefing on David's motion to reconsider, the circuit court denied the motion. In doing so, the court acknowledged failing to address the claim in Count I of Virginia breaching the 1987 agreement by blocking the sale of the Tilcon properties, but nevertheless found

no merit in the claim because Virginia's trusts were not parties to the 1987 agreement, and it was her trusts that rejected the terms of the proposed Tilcon sale.

¶ 35    Following the circuit court's denial of David's motion to reconsider, plaintiffs timely appealed the court's ruling on David's motion to reconsider and the court's ruling on the parties' cross-motions for summary judgment.

¶ 36                                II. ANALYSIS

¶ 37    Plaintiffs contend that, based on the evidence presented in their partial motion for summary judgment on the issue of liability, they were entitled to summary judgment on David's claim for breach of contract and their claim for tortious interference with prospective economic advantage. Plaintiffs therefore argue that the circuit court should have granted their partial motion for summary judgment and denied defendants' cross-motion for summary judgment, and we should remand the matter for further proceedings.[2]

¶ 38    By filing cross-motions for summary judgment, the parties agree that there are only questions of law involved, and they invite the court to resolve the litigation based solely upon the record. *Pielet v. Pielet*, 2012 IL 112064, ¶ 28. While such filings indicate the parties' agreement that there are only questions of law involved, "the mere filing of cross-motions for summary judgment does not establish that there is no issue of material fact, nor does it obligate a court to render summary judgment." *Id.* This is because a disposition of litigation on a motion for "[s]ummary judgment is a drastic measure," and such a motion "should only be granted if the movant's right to judgment is clear and free from doubt." *Seymour v. Collins*, 2015 IL 118432, ¶

---

[2] Although the circuit court also granted summary judgment to Platt on defendants' cross-motion for summary judgment on Count III of plaintiffs' amended complaint, in which David and Marylou in their individual capacities alleged Platt breached his fiduciary duty, that count is not at issue in this appeal.

42. "If the plaintiff fails to establish any element of the cause of action, summary judgment for the defendant is appropriate." *Lewis v. Lead Industries Ass'n*, 2020 IL 124107, ¶ 15. The circuit court should only grant summary judgment where the pleadings, depositions, admissions, and affidavits on file, when viewed in the light most favorable to the nonmoving party, demonstrate that there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law. *Pielet*, 2012 IL 112064, ¶ 29. A genuine issue of material fact exists where the material facts are disputed or reasonable people could draw different inferences from the undisputed facts. *Mashal v. City of Chicago*, 2012 IL 112341, ¶ 49. We review the circuit court's ruling on cross-motions for summary judgment *de novo*. *Pielet*, 2012 IL 112064, ¶ 30.

¶ 39                     A. Count I: Breach of Contract

¶ 40     The 1987 agreement contained a choice-of-law provision providing for Connecticut law as the governing law. As a general rule, we honor choice-of-law provisions in contracts. *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 351 (2002). In doing so, the substantive law on the breach of contract claim will follow Connecticut law (*Boersma v. Amoco Oil Co.*, 276 Ill. App. 3d 638, 645 (1995)), but any procedural matters, *i.e.*, the law governing summary judgment motions, will follow Illinois law. *Belleville Toyota,*, 199 Ill. 2d at 351; *Davis v. Burlington Northern Santa Fe Ry. Co.*, 2016 IL App (3d) 150464, ¶ 15. Under Connecticut law, there are four elements to a breach of contract claim: (1) an agreement; (2) performance by one party; (3) a breach by the other party; and (4) resulting damages. *Meyers v. Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.*, 87 A.3d 534, 540 (Conn. 2014). None of the parties dispute that Virginia and the Estate formed a valid agreement in 1987 whereby the Estate assumed her bank debts and advanced her approximately $1.4 million in exchange for certain obligations from her. As such, the first element of David's breach of contract claim has been met.

¶ 41    On the second element of whether the Estate performed its obligations under the agreement, there is no dispute that the Estate assumed Virginia's bank debts and provided her the cash advance. However, Virginia argues that the Estate failed to periodically furnish her counsel material data concerning the Estate, relieving her of any obligation to further perform under the agreement. See *State v. Lex Associates*, 730 A.2d 38, 45 (Conn. 1999) (asserting that one party's "material breach" of a lease "discharged [the other party] from any further obligations under the lease"). However, we do not need to determine whether the Estate's alleged prior breach of the agreement relieved Virginia of her obligation to further perform under the agreement because Virginia did not breach the agreement in the first place.

¶ 42    As to that alleged breach by Virginia, David posits that she breached the 1987 agreement's provision that stated she "shall not be entitled to and will not participate in or take part in Estate deliberations or decisions as regards the Estate or its property." David argues that Virginia breached this provision when she "extortionately" demanded that, as part of the proposed Tilcon transaction, the Estate include a direct and preferential payment to her from the Estate's portion of the sale proceeds. David asserts that Virginia threatened to block the Tilcon transaction from consummating if her demand was not met, and after the Estate could not provide Virginia her request, she blocked the transaction by refusing to allow her trusts to consent to the proposed sale. According to David, these actions by Virginia are evidence that she participated, or took part, in deliberations or decisions of the Estate regarding the Estate or its property.

¶ 43    We disagree. At the time the parties (minus Virginia and her trusts) were negotiating the sale of the Tilcon properties in 2019, the Estate owned 50% of the properties while the trusts of Virginia, David, Marylou and Larry owned 12.5% each. Given that Virginia's trusts owned 12.5% of the Tilcon properties, any deal to sell the properties to Tilcon necessarily required the consent

of Virginia's trusts. In creating those trusts, Francis specifically inserted a provision stating it was his "fond hope" that Virginia's needs would "be considered first and foremost" by the trustee. This meant that, in deciding whether to agree to sell her trusts' interest in the properties, Platt, as Virginia's trustee, had to primarily consider Virginia's needs as the trusts' beneficiary. To this end, Armstrong, Virginia's attorney, requested a direct payment to her from the Estate's portion of the sale proceeds. The Estate did not agree to Virginia's demands, and so her trusts exercised their legal right as owners of 12.5% of the properties to reject the terms of the proposed transaction as those terms and conditions were apparently not satisfactory to Virginia, as the trusts' sole beneficiary.

¶ 44    During the depositions of both David and Larry, they recognized the fact that Virginia's trusts had the legal right to reject the proposed transaction based on terms and conditions that Virginia, as the trusts' beneficiary, deemed unsatisfactory. David testified that "[o]f course" Virginia did not have to consent to the proposed transaction and "[t]hat's why she didn't." Similarly, Larry testified that he "assume[d]" she did not have to give her consent "but that's her decision." Illustrative is *Downes-Patterson Corp. v. First National Supermarkets, Inc.*, 780 A.2d 967 (Conn. App. Ct. 2001). In that case, owners of real property, who planned on leasing the property to a supermarket, sued the adjacent property owner and claimed that it violated the Connecticut Unfair Trade Practices Act (CUTPA) by failing to sign a release of a restrictive covenant that barred the plaintiffs from using the property to operate a supermarket. *Id.* at 971-74. Following a trial, a jury found the defendant violated the CUTPA, but the trial court set aside the jury's verdict. *Id.* at 974. In affirming the trial court's decision to set aside the jury's verdict, the appellate court observed that, while "the plaintiffs hoped and even expected that the defendant would sign a release of the right, the defendant was under no statutory or contractual obligation to

do so." *Id.* at 976. As a result, the appellate court concluded that, under such circumstances, "the defendant did not violate CUTPA by declining to do that which it simply was not required to do." *Id.* Although this case does not involve the CUTPA, the instant case similarly involves plaintiffs who had hoped a defendant would agree to something that she was under no statutory or contractual obligation to agree to.

¶ 45 Simply, nothing in 1987 agreement precluded Virginia's trusts from exercising their legal right to refuse to sell their interest in the properties. And the fact that Virginia's trusts exercised their legal right concerning their ownership interest in the properties is not evidence that Virginia participated, or took part, in any deliberations or decisions of the Estate regarding its 50% interest in the Tilcon properties. Rather, the record only demonstrated that Virginia, Platt and her trusts were involved after the decision was made by the Estate to sell its 50% interest in the properties to Tilcon, which it did completely independent from any input of Virginia. To be sure, in plaintiffs' amended complaint, they asserted that, "[i]n the spring of 2019, the Estate and Tilcon renewed discussions regarding the sale of the Tilcon Properties," and "Tilcon again agreed to a $16,900,000 purchase price." According to the amended complaint, after further negotiations between the parties, "the Estate, Tilcon, and all Spray Trusts other than Virginia's reached a final agreement, subject only to approval by the trustee of Virginia's Spray Trusts." "Allegations contained in a complaint are judicial admissions and are conclusive against the pleader." *Calloway v. Allstate Insurance Co.*, 138 Ill. App. 3d 545, 549 (1985). But nevertheless, the evidence in the record supports this chronology. Specifically, in Armstrong's response to Ericson's May 2019 e-mail, Armstrong asserted that Virginia had not been consulted in any manner in connection with the negotiations over the proposed terms of the Tilcon transaction. And in response to Armstrong,

Ericson stated in a June 2019 e-mail that, due to the complex nature of Tilcon's ownership, there was no ability to change the terms of the proposed transaction.

¶ 46 The only time the amended complaint alleged, or the evidence showed, Virginia or her trusts involvement was after the Estate had already agreed to sell its interest in the Tilcon properties. The affidavits by certification filed by Virginia and Platt further corroborate this fact. Therein, they asserted that neither of them were ever "asked to participate in" or be "involved in" the discussions between the Estate and the trusts of David, Larry and Marylou to sell the Tilcon properties to Tilcon. Nothing in the record contradicts these assertions. "[W]hen an opponent fails to file a counteraffidavit, the facts contained in the movant's affidavits and depositions are then accepted as true, notwithstanding any contrary assertions contained in the opponent's pleadings." *Eberle v. Brenner*, 131 Ill. App. 3d 394, 397 (1985). As such, the undisputed evidence showed that Virginia, Platt and her trusts did not participate, or take part, in decisions or deliberations of the Estate regarding the Estate or its property.

¶ 47 Because Virginia did not breach the 1987 agreement, one of the four elements in a breach of contract claim, David cannot prove his breach of contract claim on behalf of the Estate. See *Meyers*, 87 A.3d at 540. And because David cannot prove his breach of contract claim, the circuit court properly entered summary judgment for Virginia and against David on Count I. See *Lewis*, 2020 IL 124107, ¶ 15.

¶ 48 B. Count II: Intentional Interference with Prospective Economic Advantage

¶ 49 While David's breach of contract claim was based on Connecticut law in light of the agreement's choice-of-law provision, plaintiffs' intentional interference with prospective economic advantage claim is different. When determining which state's law should be followed for tort cases, Illinois uses the Restatement (Second) of Conflict of Laws. *Barbara's Sales, Inc. v.*

*Intel Corp.,* 227 Ill. 2d 45, 61 (2007). "Following the Restatement, we apply the broad principle that the rights and liabilities as to a particular issue are to be governed by the jurisdiction which retains the most significant relationship to the occurrence and the parties." (Internal quotation marks omitted.) *Id.* However, "[a] choice-of-law determination is required only when a difference in law will make a difference in the outcome." *Townsend v. Sears, Roebuck & Co.*, 227 Ill. 2d 147, 155 (2007). And here, the parties agree that there is no conflict between Illinois law—where the conduct of Armstrong, Virginia's attorney, occurred—and Connecticut law—where the Tilcon properties are located and where other relevant actions occurred. Given there is no conflict between Illinois and Connecticut law, we may apply Illinois law. See *Illinois Insurance Guaranty Fund v. Priority Transportation, Inc.*, 2019 IL App (1st) 181454, ¶ 56 (applying Illinois law where there was no conflict between Illinois, Delaware, or Wisconsin law concerning the effect of a statutory merger).

¶ 50    In Illinois, the elements of an intentional interference with prospective economic advantage claim are: "(1) a reasonable expectancy of entering into a valid business relationship, (2) the defendant's knowledge of the expectancy, (3) an intentional and unjustified interference by the defendant that induced or caused a breach or termination of the expectancy, and (4) damage to the plaintiff resulting from the defendant's interference." *Anderson v. Vanden Dorpel*, 172 Ill. 2d 399, 406-07 (1996). The focus on a tortious interference claim is the conduct of the party allegedly interfering with the business expectancy. *Dowd & Dowd, Ltd. v. Gleason*, 181 Ill. 2d 460, 484 (1998). "To prevail on the claim, a plaintiff must show not merely that the defendant has succeeded in ending the relationship or interfering with the expectancy, but 'purposeful interference'-that the defendant has committed some impropriety in doing so." *Id.* at 485; see also *Fidelity National Title Insurance Co. of New York v. Westhaven Properties Partnership*, 386 Ill. App. 3d 201, 219 (2007)

("To prevail on a claim, it is insufficient for [the] plaintiff to merely show that [the] defendant interfered with a business expectancy" but rather, the "plaintiff must show 'purposeful' or 'intentional' interference, which refers to some impropriety committed by the defendant in interfering with plaintiff's business expectancy.") Stated otherwise, the plaintiff must demonstrate that the defendant intentionally acted with the purpose of injuring the plaintiff's economic expectancy. *Fidelity National*, 386 Ill. App. 3d at 219. To this end, this court has observed that "[t]o the extent [ ] a party acts to enhance its own business interests, it has a privilege to act in a way that may harm the business expectancy of others." *Curt Bullock Builders, Inc. v. H.S.S. Development, Inc.*, 225 Ill. App. 3d 9, 16 (1992).

¶ 51    Although the defendant's conduct is chiefly at issue, that conduct must be directed at a third party "with whom the plaintiff expects to do business." *Schuler v. Abbott Laboratories*, 265 Ill. App. 3d 991, 994-95 (1993); see also *Associated Underwriters of America Agency, Inc. v. McCarthy,* 356 Ill. App. 3d 1010, 1020 (2005) (observing that, in an intentional interference with prospective economic advantage claim, there must be "a business expectancy with a specific third party as well as action by the defendant directed towards that third party"). "It is not enough for the defendant's action to impact a third party; rather, the defendant's action must be directed towards the third party." *Boffa Surgical Group LLC v. Managed Healthcare Associates Ltd.*, 2015 IL App (1st) 142984, ¶ 28. For instance, in *Schuler*, 265 Ill. App. 3d at 992, an individual sued his former employer, Abbott Laboratories, for tortious interference with prospective economic advantage based on Abbott threatening to enforce a non-competition agreement if he began working for either of two prospective companies. On appeal from the dismissal of his complaint, the appellate court observed that Abbott merely informed the plaintiff that it would seek to enforce the non-competition agreement if he began working at either of the prospective companies. *Id.* at

994-95. The court noted that the plaintiff failed to allege any facts establishing Abbott "spoke to or communicated directly with" those prospective companies. *Id.* at 995. Although the court highlighted that enforcing the non-competition agreement would likely affect "others beside [the plaintiff]," the court asserted that "Abbott conducted no activity with anyone but [him] and expressed a desire only to prevent [him] from violating the letter of his agreement." Because the appellate court found that the plaintiff did not allege Abbott took any "action directed at a third party," it affirmed the circuit court's dismissal. *Id.* at 995-96.

¶ 52    In the instant case, similar to the facts of *Schuler*, plaintiffs have failed to set forth any evidence that defendants' conduct was directed toward Tilcon, as a third party. In claiming that defendants intentionally and unjustifiably interfered with their business expectancy, plaintiffs rely on the July 2019 letter from Armstrong on behalf of Virginia and her trusts. In that letter, Armstrong asserted that Virginia would only agree to the proposed Tilcon transaction if she received her share of the Estate's proceeds directly at closing (as opposed to waiting until she received her share from the Estate as part of the Estate closing). However, Armstrong sent that letter to Ericson, the Estate's representative and attorney, and not to Tilcon. In fact, in a deposition, David testified that he was unaware of any conversations that defendants had with Tilcon. Similarly, Wall, Tilcon's corporate representative, testified in a deposition that, although Tilcon and Virginia may have had conversations regarding her back rent lawsuit, they did not have any direct conversations about the proposed Tilcon transaction. Based on the evidence, although defendants' conduct may have impacted Tilcon, their conduct was not directed at Tilcon. See *Boffa*, 2015 IL App (1st) 142984, ¶ 28 ("It is not enough for the defendant's action to impact a third party; rather, the defendant's action must be directed towards the third party.").

¶ 53    Furthermore, nothing in the record showed that defendants desired to interfere with plaintiffs' business expectancy, only that they acted in furtherance of the personal interests of Virginia and her trusts. See *Gleason*, 181 Ill. 2d at 484 (asserting that "[t]o prevail on the claim, a plaintiff must show not merely that the defendant has succeeded in ending the relationship or interfering with the expectancy, but 'purposeful interference'-that the defendant has committed some impropriety in doing so"). According to affidavits by certification filed by Virginia and Platt, Virginia's refusal to allow her trusts to agree to the sale "was not based on a desire to harm" her siblings or the Estate but rather her "concern[ ] that any proceeds from" the proposed sale that would go into the Estate would ever "come out to the benefit of [her] or [her] [t]rusts." No evidence contradicts these assertions. "[W]hen an opponent fails to file a counteraffidavit, the facts contained in the movant's affidavits and depositions are then accepted as true, notwithstanding any contrary assertions contained in the opponent's pleadings." *Eberle*, 131 Ill. App. 3d at 397. Such assertions were also corroborated by Virginia's lawsuit against David, amongst others, in state and federal court, where she alleged that David concocted a long-term plan "to plunder, pillage and loot the over $162,000,000 in assets of [the Estate]" and Armstrong's July 2019 letter, where he reiterated Virginia's belief that David was mismanaging the Estate.

¶ 54    In this vein, as the circuit court observed, to the extent that defendants' conduct could be deemed directed at Tilcon, that conduct was not wrongful. Given that Virginia's trusts owned 12.5% of the Tilcon properties, they were well within their legal right, as part-owner, to reject the terms and conditions of the proposed transaction based on Virginia's belief that they were not satisfactory to her. Both David and Larry recognized this fact during their depositions when they testified that Virginia did not have to grant consent to the proposed transaction in light of her trusts' ownership interest. Although defendants' demand for compensation to agree to the proposed

transaction may have been bold, Virginia and her trusts had the right to act in furtherance of her own best interests even if the demand ultimately could not have been accommodated. See *Curt Bullock*, 225 Ill. App. 3d at 16 (noting that "[t]o the extent that a party acts to enhance its own business interests, it has a privilege to act in a way that may harm the business expectancy of others").

¶ 55    Nevertheless, plaintiffs highlight that an Internal Revenue Service's estate tax closing letter valued the Estate at $25,726,175, and after deducting approximately $14 million in federal and state estate taxes as well as individual bequests, only approximately $2.7 million remained for each of the surviving beneficiaries before deducting any administrative expenses. As such, according to plaintiffs, the $3.9 million payment Virginia already received from the Estate as part of the 1987 agreement would have exceeded her share of the Estate's value. In other words, Virginia's demand for direct compensation as part of the Tilcon transaction was impossible to accommodate because she would not be entitled to any proceeds from the Estate once it closed given her indebtedness to the Estate based on the 1987 agreement. As a point of clarification, the $25,726,175 figure was the "[t]axable" value of the estate. Regardless, the IRS letter was from 1990, and the proposed Tilcon transaction fell through in 2019. Given inflation between 1990 and 2019, the claimed value of the Estate would have been worth significantly more in 2019 than in 1990. Thus, plaintiffs' reliance on an IRS estate tax closing letter from 1990 does not prove Virginia's demand was impossible to accommodate in 2019.

¶ 56    Based on the evidence, defendants' actions were in furtherance of their own personal interests rather be in furtherance of some nefarious motive toward plaintiffs. See *Fidelity National*, 386 Ill. App. 3d at 219 (observing that "[t]o prevail on a claim [of tortious interference with business expectancy], it is insufficient for plaintiff to merely show that defendant interfered with

a business expectancy," rather the "plaintiff must show 'purposeful' or 'intentional' interference, which refers to some impropriety committed by the defendant in interfering with plaintiff's business expectancy"). Thus, as the circuit court observed, to the extent defendants' conduct in refusing to agree to the proposed Tilcon transaction could be construed as being directed toward Tilcon, there was nothing wrongful about it.

¶ 57    Nonetheless, plaintiffs posit that, while the third-party requirement applies in situations of bilateral expectancies, *i.e.*, situations in which there is only one other party toward whom a defendant can direct its tortious interference, the third-party requirement does not apply to multi-party expectancies, *i.e.*, situations in which there are more than one party toward whom a defendant can direct its tortious interference. Plaintiffs provide no Illinois case law supporting their argument. Instead, plaintiffs attempt to argue that there are no Illinois decisions applying the third-party requirement to situations involving multi-party expectancies. As defendants aptly note, the logic of this argument is flawed because the absence of a case rejecting the existence of an exception does not prove that the exception exists. The lack of Illinois case law excepting the third-party requirement from multi-party expectancies dooms plaintiffs' argument. See *Miller v. Illinois Municipal Retirement Fund*, 2019 IL App (5th) 180267, ¶ 12, n.1 (refusing to consider a party's argument where that party did "not present[ ] any authority in support of such a proposition").

¶ 58    Still, plaintiffs attempt to argue that, from the perspective of David and Marylou's trusts, the Estate was a third party. And thus, because defendants' alleged interference was directed at the Estate, and thus, a third party from the perspective of David and Marylou's trusts, the third-party requirement was satisfied. However, Illinois law is clear that, in order to prove a tortious interference claim, the plaintiff must show "a business expectancy with a specific third party as well as action by the defendant directed towards that third party." *McCarthy*, 356 Ill. App. 3d at

- 29 -

1020. As defendants note, in plaintiffs' amended complaint, they alleged that, "[i]n 2019, the Estate and David and Marylou's Spray Trusts had an expectancy of entering into a contract with Tilcon for the sale of the Tilcon Properties." From the perspective of David and Marylou's trusts, there was no business expectancy with the Estate because Tilcon was the party with whom the trusts had their business expectancy. Therefore, plaintiffs' attempts to cast the Estate as a third party is unpersuasive.

¶ 59    Because plaintiffs have failed to show an intentional and unjustified interference by defendants, one of the four elements in an intentional interference with prospective economic advantage claim, they cannot prove their claim. See *Anderson*, 172 Ill. 2d at 406-07. And because plaintiffs cannot prove their intentional interference with prospective economic advantage claim, the circuit court properly entered summary judgment for defendants and against plaintiffs on Count II. See *Lewis*, 2020 IL 124107, ¶ 15.

¶ 60                                III. CONCLUSION

¶ 61    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 62    Affirmed.